RIGOBERTO PEREIRA Y OTROS, demandantes-recurridos y recurrentes, *v.* INTERNATIONAL BASIC ECONOMY CORP., y TANA DEVELOPMENT CORP., demandadas-recurrentes y recurridas.

*Números:* R-64-26, R-64-30, C-64-24 *Resueltos:* 26 de junio de 1967

32

*Peñagarícano & Lloveras,* abogados de los demandantes-recurridos y recurrentes; *Fiddler, González & Rodríguez, Ángel Fiol Negrón* y *Federico Tilén,* abogados de las demandadas-recurrentes y recurridas; *Baragaño, Trías, Saldaña & Francis,* abogados del *amicus curiae* Asociación de Constructores de Hogares de Puerto Rico, Inc.

—O—

*Peñagarícano & Lloveras*, abogados de los demandantes-recu-rridos y recurrentes; *Fiddler, González & Rodríguez, Ángel Fiol Negrón* y *Federico Tilén*, abogados de las demandadas-recurrentes y recurridas; *Baragaño, Trías, Saldaña & Fran-cis*, abogados del *amicus curiae* Asociación de Constructores de Hogares de Puerto Rico, Inc.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Se plantean en estos recursos, entre otras, una serie de cuestiones fundamentales relacionadas con la actividad de la construcción de hogares. Lo que resolvemos con respecto a las mismas habrá de complementar la doctrina que esta-blecimos en *Géigel* v. *Mariani*, 85 D.P.R. 46 (1962). Los planteamientos principales exigen que determinemos (a) si procede recobrar tanto bajo la acción *quanti minoris* a que tienen derecho los compradores de edificaciones contra el

vendedor, según los Arts. 1373, 1374 y 1375 del Código Civil (31 L.P.R.A. secs. 3841, 3842 y 3843), como del contratista que construyó las edificaciones en cuestión, de acuerdo a lo dispuesto en el Art. 1483 del Código Civil (31 L.P.R.A. sec. 4124); [1] (b) cuál es el alcance de la "ruina por vicios de la construcción" que da base para la acción decenal provista por el Art. 1483 del Código Civil; y (c) si en adición a la responsabilidad del contratista bajo las disposiciones antes citadas, es éste, además, responsable por su negligencia incurrida en llevar a cabo la construcción.

—I—

### Naturaleza de las Reclamaciones

El caso Núm. 61-5569 que incluye 75 de los demandantes-recurridos-recurrentes (en lo sucesivo designados como los reclamantes), se consolidó con los casos Núms. 61-8057, 61-8922, 61-8923, 62-1887, 62-2197, 62-3061, 62-3632 y 62-4064, o sea, que el total de los reclamantes es de 83, que son los 80 enumerados como tales en la sentencia del tribunal de instancia más los casos de Rafael Carle Sifre, Germán Sigurany y Luis González Quiñones, que dicho tribunal omitió de la referida enumeración, pero que aparecen incluidos en las conclusiones de hecho adicionales que a petición de las demandadas realizó dicho tribunal. De éstos, los siguientes adquirieron sus propiedades de otros reclamantes, luego de radicado el caso Núm. 61-5569, quedando sustituidos en su lugar: Robert E. Trent, Luis González Quiñones, Germán Sigurany, José A. Rivera, Ernesto Reyes Arnaldi, José Cas-

---

[1] El Art. 1483 del Código Civil dispone:

"El contratista de un edificio que se arruinase por vicios de la construcción, responde de los daños y perjuicios si la ruina tuviere lugar dentro de diez años, contados desde que concluyó la construcción; igual responsabilidad, y por el mismo tiempo, tendrá el arquitecto que la dirigiere, si se debe la ruina a vicios del suelo o de la dirección.

"Si la causa fuere la falta del contratista a las condiciones del contrato, la acción de indemnización durará 15 años."

tellanos Lloréns, Manuel A. Fernández, José Ramón González y Fernando Barron. La escritura de venta a favor de Trent contiene una cesión de los derechos del vendedor en la causa iniciada por éste contra las demandadas. Una cesión similar se realizó en la venta a Sigurany. No se hizo esto en los demás casos. El juez sentenciador determinó que "en todos dichos casos los demandantes originales salieron del pleito quedando sustituidos por sus respectivos compradores."

En síntesis, los reclamantes alegaron que cada uno de ellos compró de la demandada-recurrente-recurrida Tana Development Corp., (en lo sucesivo designada como Tana) un solar, más una casa construida en el mismo por la demandada-recurrente-recurrida International Basic Economy Corp., (en lo sucesivo designada como Ibec), para Tana, en la urbanización conocida como Highland Park, en Río Piedras, P.R.; que en dichas casas existían vicios de construcción ocultos en el momento de su venta a cada reclamante consistentes de techos defectuosos, desprendimientos, grietas en paredes, instalación defectuosa de puertas y ventanas, pintura dañada, losetas partidas y descoloridas en pisos, tubería y electricidad defectuosa. Se reclaman determinadas cantidades para corregir los referidos vicios más gastos de mudanza y arquitectura. Por enmienda subsiguiente, los reclamantes aclararon que las acciones contra Tana son de *quanti minoris* bajo los Arts. 1373 y 1375 del Código Civil, y en tal virtud se alegó que la "suma razonable de cuanto menos hubiera pagado [la parte reclamante] de haber sabido al momento de la compra las condiciones en que se hallaba dicha casa, es de $6,000.00." Se responsabilizó, además, a Ibec por los daños y perjuicios ocasionados por su actuación dolosa, maliciosa y torticera consistente en haber experimentado con un tipo de techo en Highland Park con conocimiento de que el experimento no iba a tener resultado al

extremo que fracasó, sin previamente advertirlo a cada comprador reclamante.

La demanda en el pleito Civil Núm. 61-5569 fue contestada en 23 de marzo de 1962. Se aceptó en la contestación que Ibec fue la constructora de las casas y Tana fue la vendedora. Se aclara que Ibec construyó para Tana y Tana vendió las casas ya construidas junto con los solares. Se negó por falta de conocimiento las demás aseveraciones de la demanda y se alegó que Tana e Ibec se han visto privadas de constatar la certeza de las aseveraciones de la demanda por la oposición de los reclamantes a que ellas inspeccionaran las casas. En dicha contestación a la demanda, Tana expone las siguientes defensas especiales:

1) La demanda no expone hechos, en ninguna de las causas de acción, que justifiquen la concesión de un remedio a favor de los reclamantes en contra de Tana.

2) La acción *quanti minoris* de los reclamantes contra Tana se extinguió en cuanto a todas las causas de acción por haberse instado más de seis meses después de la entrega de las casas.

Ibec expuso y alegó las siguientes defensas especiales:

1) La demanda no expone, en ninguna de las causas de acción, una reclamación que justifique remedio a favor de los reclamantes en contra de Ibec.

2) No existe relación contractual alguna entre los reclamantes e Ibec, sólo la hay entre Tana e Ibec. Tampoco tienen los reclamantes acción alguna contra Ibec por daños y perjuicios o por cualquier otro concepto. Cualquier acción por vicios de construcción pertenecería a Tana y ésta no trasmitió a los reclamantes derecho personal alguno. Sólo les trasmitió el título de las propiedades vendidas.

3) En el supuesto de que los reclamantes hubieran adquirido derechos personales pertenecientes a Tana contra Ibec,

tales derechos serían sólo los consagrados en los Arts. 1059 y 1060 del Código Civil (31 L.P.R.A. secs. 3023 y 3024) entre los cuales no están los daños por sufrimientos físicos, mentales o emocionales. Tales daños, de existir, no fueron ni pudieron ser previstos al hacerse las obras. Otros daños son improcedentes, inciertos, remotos y especulativos.

4) Ibec no responde a los reclamantes hasta que éstos hayan agotado todos los remedios que le asisten contra Tana y hayan hecho excusión de los bienes de ésta.

Como defensas especiales comunes se alegaron:

1) Todas las reclamaciones han prescrito o están extinguidas (31 L.P.R.A. sec. 3847).

2) En el supuesto de existir defectos, éstos son de poca importancia, usuales y de fácil corrección. Los reclamantes no han permitido que se efectúen tales correcciones, *agravando* así, en lugar de mitigar, los daños.

3) La causa de acción #60 no procede por no haber sido entablada por el administrador de la sociedad de gananciales.

4) La causa de acción #66 no procede por no estar ejercitada por los dueños de la casa.

5) Las causas de acción núms. 15, 22, 24, 28, 58, 69, 73 y 75 no proceden, pues están entabladas por personas con quienes ni Ibec ni Tana han contratado.

6) No procede la #37 por no ser Julio A. Machuca Rodríguez, quien figura como reclamante, el dueño de la propiedad.

7) La causa #61 deja de incluir a Olga Santiago Méndez quien es co-propietaria.

8) No procede la causa de acción #70 porque el reclamante no es el dueño de la casa.

9) No ha habido daños puesto que las casas tienen más valor real que el precio pagado por ellas. Es decir, las casas hoy día han adquirido más valor.

## —II—

### Dictamen del Tribunal de Instancia

Se dictó sentencia en 13 de diciembre de 1963, y en 31 de enero de 1964 el tribunal de instancia, a petición de parte, suplementó sus determinaciones con extensas conclusiones adicionales, y en tal virtud, declaró con lugar las demandas excepto la 66(a) radicada a nombre de Julia M. Benítez. Condenó a Tana a resarcir a cada uno de los reclamantes el *10% del precio* que pagaron por cada casa—en el caso de diez reclamantes esta cuantía se determinó en el 15% de dicho precio—y condenó a Ibec a pagar a cada reclamante en cada caso:

1) $550 ó $650 para un *built-up roof*, según sea la casa del tipo "Acapulco" o "Montecarlo", excepto en dos que ya lo tienen.

2) $225 para eliminar cartón usado para rellenar marcos de puertas y ventanas y fijación o ajuste más sólido de éstas.

3) $200 para reparación de grietas en paredes, excepto en dos casos.

4) $750 para corregir grietas y manchas del plafón y pintar lo corregido en plafones y paredes.

5) $250 ó $325, según el tipo de cada casa, con excepción de nueve, para reparación y cambio de losetas manchadas y rotas en sus puntas o bordes.

6) $1,500 por concepto de daños y perjuicios ocasionados como consecuencia de los vicios o defectos de construcción. Se fijó la cuantía en $2,500 por este concepto, en 10 casos.

Se condenó a ambas demandadas al pago de costas y al pago de $300 de honorarios de abogado por cada caso, 1/3 por Tana y 2/3 por Ibec.

—III—

## Resumen de los Hechos

Siete de los reclamantes y los cónyuges de tres de ellos declararon, en síntesis, que luego de mudarse descubrieron defectos en sus respectivas casas consistentes de filtraciones en el techo, por las losas y juntas, desprendimientos de material del techo, numerosas grietas en los plafones y paredes, losetas en los pisos descoloridas o de colores distintos, rotas y sueltas, marcos de puertas y ventanas desnivelados y separado del hormigón, notándose que se sale un papel cartón usado entre el marco y el hormigón, de manera que se ve luz a través (el testigo Partridge testificó que en su casa los marcos y puertas estaban en buenas condiciones); que la pintura está descascarándose; que Ibec trató de reparar muchos de estos defectos en varias ocasiones pero que las filtraciones y grietas volvieron a ocurrir; que los reclamantes han sufrido angustias y sufrimientos mentales, grandes inconvenientes, humillaciones al llevar a sus amigos a sus casas y éstos observar las referidas condiciones de las viviendas y han llegado hasta temer por la salud de sus hijos. El reclamante Partridge declaró que inspeccionó la casa modelo que Ibec construyó en el parque de estacionamiento del centro comercial (*Shopping Center*) y que esperaba que la casa que él iba a adquirir fuese como aquélla. Se estipuló que "todos y cada uno de los restantes demandantes y/o sus esposas declararían sustancialmente en igual forma . . . ."

Cada uno de los reclamantes que fueron compradores de viviendas de Tana, primeramente suscribieron con ésta un contrato bilateral de compraventa por virtud del cual Tana convino entregarle al reclamante un solar de un área específica en metros cuadrados en el cual Tana se comprometió a construir una casa de conformidad con determinado plano aprobado por la Administración Federal de Hogares y la

Junta de Planificación, y de acuerdo con el plano de construcción radicado en el Negociado de Permisos y en el cual se dice que el comprador ha examinado el plano de la urbanización y el plano y especificaciones de la vivienda. Se fijó un precio por la propiedad según del tipo Acapulco, o sea, las más pequeñas, y Montecarlo las más grandes, sujeto a los ajustes que puedan realizarse en la cabida del solar, para el caso de alza en los jornales del constructor, y además, Tana se reservó el derecho de hacer cambios de menor importancia y variaciones en detalle que a su juicio hicieran la propiedad más vistosa, conveniente, cómoda y que tiendan a dar más variedad a la urbanización. Se proveyó, por último, la forma y manera de transferir el título de la propiedad al terminarse la construcción y la forma de pagar el precio de compra en adición al pronto pago. Como parte de la operación, de conformidad con la Sec. 801 de la Ley de Vivienda de 1954 de los Estados Unidos, Tana suscribió en cada caso, a favor del comprador, una garantía de que la casa ha sido construida sustancialmente de acuerdo con los planos y especificaciones (incluyendo enmiendas, cambios y variaciones de los mismos) aprobados por el Comisionado Federal de Hogares la cual aplicará a los casos de inconformidad sustancial con planos y especificaciones notificados al garantizador dentro del año de la fecha de transferencia de título al comprador o de la fecha de terminación de la construcción o de la ocupación inicial de la vivienda, de estas fechas la que ocurra primero, conviniéndose que esta garantía es adicional a cualesquiera otros derechos y privilegios que el comprador tuviere en derecho o por convenio y subsistirá no obstante lo que en contrario se disponga.

Con motivo de la inspección ocular que hiciera de 48 de las casas en cuestión, concluyó el juez sentenciador que:

"14. . . . existen en su totalidad grietas en las losas de los techos, habiéndose corregido en bastantes casos muchas de esas grietas con aplicación de brea u otro material."

Y, además,

"15. Que en los plafones de todas las casas existen grietas diversas y de distintos tamaños habiéndose en muchos casos intentado su eliminación, sin lograrse, y causando ello la aparición de manchas que se extienden a toda la extensión de la grieta; que en muchas casas estas grietas del plafón producen la impresión de existir un proceso de deterioro en dicho plafón; que en todas las paredes existen grietas verticales cuya reparación se ha intentado reproduciéndose una vez más con revelación de manchas; que con [sic] la gran mayoría de las casas observamos existen [sic] una reiteración de la grieta horizontal entre el techo y las paredes que se extiende en gran parte de las casas por todo el perímetro de las mismas; que las uniones o juntas de las losas de los techos y los cuales han sido tratados en forma tal que existe una capa de brea a todo lo largo de la junta que se levanta perceptiblemente del nivel corriente de la losa con el propósito de rechazar el agua pero que cuando hay fuerte lluvia y resultan insuficientes los desagües el caudal de agua acumulado sobre el techo penetra la brea protectora produciendo filtraciones en unos casos y manteniendo agua estancada con la consiguiente reserva de humedad y manteniendo ampollas de agua que al ser oprimidas con el pie dejaban escapar el agua retenida; que varias de las casas revelaban claramente la existencia de filtraciones al través de las losas fuera de las juntas; que la pintura en bastantes casas presentaba ampollas y escamas indicando un proceso de despegue de la superficie a la cual se había adherido la pintura; que las losetas de los pisos en muchas de las casas estaban con desprendimientos o picaduras en los bordes y esquinas y manchadas de un color rojizo debido a la existencia de materias ferruginosa en los materiales usados para confeccionarlas; que en los frentes de las casas habían grietas perceptibles a primera vista y muchas de ellas atravesaban la pared de un lado a otro. Que un cálculo promedio prudente indica que en estas casas existían no menos de 25 grietas grandes y no menos de 60 grietas de las llamadas 'hair cracks'; que habían defectos en los closets y en algunas casas la unión que atravesaba los closets había dañado los mismos con las filtraciones; que los marcos de las puertas y ventanas en muchas casas ofrecían descuadres y los huecos entre el concreto o marco de la puerta

o ventana que se había rellenado originalmente con cartón y cubierto exteriormente por alguna materia encubridora, debido al batir de las puertas o a la acción de la lluvia y el viento, se había caído la materia encubridora permitiendo la penetración del agua y al mojarse el cartón producía la inflación del mismo y su caída dejando intersticios que permitían la penetración de la luz exterior a la habitación; que había gran número de losetas que revelan oquedad a la percusión, revelando insuficiente solidez que causaba con el uso el despegue de la loseta.

Habiendo las partes estipulado que la inspección del resto de las casas de los otros demandantes revelan una situación promedio a la revelada por éstas en la inspección ocular inferimos que en las demás no inspeccionadas existen los mismos hallazgos que arriba hemos expuesto."

El récord revela que era parte de esta estipulación que "en caso que procediera alguna compensación, pues, por las otras casas no visitadas se hiciera por·el tribunal a base de un promedio del conjunto de las casas visitadas ya."

"23. Que las losas de los techos de estas casas tenían un refuerzo de una malla de acero (wire-mesh) de dos octavo de diámetro colocado en la parte inferior de la losa bastante cercano a la superficie interior de la misma que sostiene el concreto celular (foam-concrete) del plafón.

"24. Que la malla de acero (wire-mesh) usada como refuerzo en la losa de los techos de las casas de los demandantes tenía los alambres de acero tejidos a una separación de seis pulgadas y los peritos recomiendan para casos de refuerzo de losa de pulgada y media de espesor como las usadas en los techos de las casas de Highland Park el uso de una malla de acero (wire-mesh) tejidos los alambres a dos pulgadas.

"25. Que los cambios bruscos de temperatura que causan el enfriamiento súbito de una losa de techo expuesta a un sol caliente con motivo de un aguacero súbito produce grietas como las aparecidas en los techos de las casas de los demandantes y contribuye a aumentarlas de acuerdo con la frecuencia del fenómeno."

"31. Que las demandadas no le informaron a los demandantes el tipo de techo que habrían de construir para todas las casas compradas por los demandantes."

"37. Que la incidencia de filtraciones en los techos de estas casas por la junta de las losas es de alrededor de dos terceras partes a una tercera parte por otros sitios.

"38. Que el 'built-up-roof' es un sistema de proteger los techos contra filtraciones y su eficacia promedio de garantía dura solamente diez años."

"42. Que los demandante [*sic*] abrigaban dudas de que los techos se colaran más usando 'thoroseal' que si hubieran usado 'alumination' y por ello optaron por cambiar a este último material, aunque siempre albergaron duda razonable de que los techos siempre se colaran."

"49. Que el sistema de hormigón celular (foam-concrete) y las losas prefabricadas para los techos la usaron las demandadas por primera vez en la casa modelo y ésta cóló el agua y no se le informó nada de ello a los demandantes."

"13. Que los marcos de las puertas y las ventanas de las casas de este litigio se colocaban en el marco de concreto de la pared rellenando los espacios entre el hueco de la pared y el marco con el uso de cartón el cual al venir en contacto con el agua, debido a haberse caído la pequeña cantidad de macilla, concreto o pintura con las cuales se trabajaban dichos rellenos se mojaban y al mojarse se expandían brotándose en algunos sitios hacia afuera y finalmente permitiendo en muchas de las casas intersticios por los cuales se colaba fácilmente la luz."

"35. Que los marcos usados para fijar las puertas en las casas de los demandantes eran cóncavos y estaban cogidos a taquetes que a su vez estaban clavados con clavos muy cortos en el concreto, por lo que no quedaron sólidamente fijos en el hueco del concreto y con el batir de las puertas se aflojaron en forma notoria."

"16. Que los planos y especificaciones que habrían de regir para la construcción de las casas compradas por los demandantes fueron aprobados por la Administración Federal de Hogares y la Junta de Planificación de Puerto Rico.

"17. Que las obras de construcción de las casas de la Urbanización Highland Park fueron supervisadas e inspeccionadas por representantes de la Administración Federal de Hogares y

de la Junta de Planificación de Puerto Rico y finalmente impartieron la aprobación a las mismas para su ocupación por los compradores originales."

"41. Que las demandadas introdujeron algunas alteraciones en los planos de las casas según se reveló de las copias de dichos planos sometidos a la F.H.A. y a la Junta de Planificación de cuyas alteraciones notificaron a la F.H.A. pero no notificaron de todas a la Junta de Planificación ni a los demandantes personalmente."

"21. Que las demandadas una vez informadas de las deficiencias que presentaban las diversas casas vendidas a los demandantes efectuaron la reparación de aquellos defectos informados por los demandantes en muchas de las casas de éstos llevando personal de reparación a las distintas casas en muchas ocasiones por más de cuatro o seis veces.

"22. Que los desperfectos informados a las demandadas y especialmente las grietas en los plafones y paredes a pesar de ser tratadas y corregidas por las demandadas se reproducían y aumentaban."

"52. Que Pedro Silva era capataz de mantenimiento y tenía un número de hombres a su cargo para el mantenimiento de las casas que fue aumentado a medida que se iba entregando las casas a los compradores."

En sus conclusiones de hecho, sigue manifestando el juez sentenciador lo siguiente:

"Nos dice Pedro Silva que había una caseta-oficina con una joven que recibía las quejas e informaciones de las deficiencias descubiertas en las casas de los propios demandantes y las ponía por escrito para ser luego procesadas. Ese testigo declaró que las reparaciones que se empezaron a hacer en las casas no dieron resultado y se adoptó otro método para corregirlas. El Ingeniero Muratti [perito de Tana-Ibec] declaró que vio en las casas que inspeccionó grietas en paredes, en los techos, en plafones que eran en todas las casas en número de cincuenta y una (51) que él inspeccionó; que vio 'cleveage-cracks' y 'fracture-cracks' en todas las casas y que el asfalto puesto en las juntas no estaba bien puesto; que las puertas de estas casas son extensamente grandes y constituyen un defecto de construcción; que las manchas de las paredes con motivo de la corrección de las grietas

en las mismas son feas a la apariencia; que las filtraciones por las losas y las juntas son defectos de construcción; que si existe la necesidad de reparar, el defecto es de construcción; que la casa de Julio Pietrantoni Vélez presenta un defecto de construcción porque debido a que la pared no llegó al nivel del techo hubo que rellenar el espacio para llegar al techo; que la casa de Rigoberto Pereira no fue bien hecha pero que de acuerdo con la construcción moderna hay que soportar defectos de construcción por la inhabilidad de la mano de obra moderna; que la apariencia es un factor importante y que en la casa de Julio Pietrantoni Vélez hay el grado máximo de defectos; que las casas con defectos son más bien desagradables; este mismo perito Muratti declaró que hay dos medios de corregir el plafón: 1ro.) usando 'styrofoam' y 2ndo.) usando pintura epóxica. Dice Muratti que la pintura del plafón costaría Cincuenta Dólares ($50.00) por la parte de adentro y Veinticinco Dólares ($25.00) para pintar los aleros por fuera. Declara Muratti que el hormigón celular (foam-concrete) absorbe agua a razón de 2.52% por pie cúbico y el hormigón corriente consume a razón de .05%, o sea, 2½ veces menos que el hormigón celular.

El Ingeniero Padilla [perito de Tana-Ibec] quien hizo una inspección de todas las casas de este caso para dictaminar sobre costos de reparación de los defectos declaró que algunas de las puertas construídas en estas casas son fuera de lo normal y que una brisa fuerte produce en ellas 'cross ventilation' y produce golpes que ocasionan los despegues de los marcos y la caída de la macilla de las rendijas entre los marcos y el hormigón. Dice también Padilla que las puertas no tienen mocheta y que si las tuvieran tendrían más solidez; que los golpes de las puertas producen grietas y que él usaría cartón para rellenar los huecos entre los marcos y el hormigón como último extremo y que mejor usaría una masilla más firme. El testigo Ángel J. Samaritano [perito de Tana-Ibec] declaró que vio el 'Alumination' que tienen los techos de las casas de Highland Park y que eso no es permanente en esta clase de techo o construcción; que el 'Alumination' dura de seis meses a tres años. Recomienda Samaritano el uso de la pintura 'epóxica' como una medida temporera porque esos son métodos nuevos y él no da opinión sobre su uso. Padilla declaró también al ver fotografías de la casa de Julio Pietrantoni Vélez que habría que demoler casi toda la pared a que se refería."

Con respecto a la naturaleza de los defectos observados por el juez sentenciador, dictaminó éste en la sentencia en estos casos que:

". . . El conjunto de los defectos en la construcción nos presenta un cuadro de dolorosa realidad para los demandantes que esperaban tener una casa como la casa modelo que se les mostró. Los demandantes experimentaron la frustración propia de quien tiene la expectativa de alcanzar una relativa comodidad tras un sacrificio de adquirir una casa para vivirla y luego se encuentra que la incertidumbre respecto a su solidez y duración le inquietan y que debe estar alerta en las horas de una noche de tiempo intempestivo para evitar que sus hijos sufran los inconvenientes de las filtraciones y proteger sus muebles y ropas contra la acción destructiva de la inclemencia del tiempo."

En cuanto a la ruina que contempla el citado Art. 1483 del Código Civil, resolvió el tribunal de instancia que:

"Es cierto que los demandantes están ocupando sus casas totalmente. Para ello asumieron la obligación de pagarlas en un largo plazo de años. ¿Pero acaso porque las tengan que usar se puede decir que las disfrutan a plenitud? No hay duda de que hasta este momento las casas no se han convertido en impropias para su uso como residencias pero tampoco la hay de que los defectos de construcción que tienen han limitado seriamente ese mismo uso, de forma tal que los demandantes no se sienten satisfechos de la compra de sus hogares. El uso o disfrute de la cosa que contempla el Artículo 1373 del Código Civil no es solamente el uso material sino también el uso o disfrute de la misma en la espiritual convivencia en el seno de la comunidad.

La ruina que contempla el Artículo 1483 del Código Civil no es la total destrucción de determinada estructura, es más bien aquel estado de solidez disminuída perceptiblemente y en proceso de acrecentamiento del cuadro de deficiencias de construcción inusitada. En el panorama general, las casas de los demandantes, de no ser reparadas y protegidas adecuadamente de esos vicios de construcción la ruina estructural de las mismas habría de ser en corto plazo una realidad."

Con respecto a la acción contra Ibec, la sentencia en cuestión dispone que:

". . . Nada contrataron los demandantes con Ibec pero pasados a ser dueños de las casas construídas por ella a virtud de compra que hicieran directamente a Tana o a sus cesionarios, compradores originales y habiendo ejercitado su acción dentro del término prescrito por la ley no puede haber duda de que la suya es una acción contra Ibec por razón de la culpa de ésta al construir las casas con los vicios de construcción que revela la prueba. La responsabilidad de Ibec no se limita al caso en que el vicio de construcción ocasiona la ruina total de lo edificado. También es responsable Ibec de la ruina parcial en estos casos. Su obligación de indemnizar por los vicios de construcción es una que se extiende a favor de cualquier propietario que adquiera una de estas casas, si éste hacía su reclamación dentro del término fijado por la ley. Las demandadas sostienen que los demandantes están usando sus casas en todas sus dependencias, sin limitación alguna. Lo primero es cierto, no así lo segundo que no está sostenido por la prueba. Esta nos demuestra que los demandantes han sido presas de grandes preocupaciones por la seguridad de sus hijos; que en horas de la noche han tenido que levantarse para proteger a sus hijos y sus pertenencias de la acción del tiempo al provocar las filtraciones y que se han tenido que abstener a veces de la comunicación social con familiares y amigos rehuyendo el que sus casas sean observadas en el estado de apariencia que presentan con las grietas y manchas de las mismas."

Como cuestiones de derecho concluyó el tribunal de instancia:

"6. Que los vicios o defectos de construcción que existían en las casas de los demandantes, según éstos surgen de la prueba, son vicios o defectos que exceden la medida de las imperfecciones que cabe esperar en una construcción de hormigón."

"8. Que la demandada Ibec, si bien es cierto que actuó negligentemente al continuar la construcción de las casas de este pleito usando el tipo de techo prefabricado (Pre-cast) en las mismas no obstante saber que su uso constituía un riesgo por ser un experimento que no habría de ser satisfactorio con vista a los resultados obtenidos en la casa modelo, no actuó dolosa o

fraudulentamente en la construcción de las casas de la Urbanización Highland Park.

9. Que habiéndose establecido por la prueba la existencia de vicios o defectos de construcción que exceden la medida de las imperfecciones que cabe esperar en una construcción de hormigón en todas y cada una de las casas envueltas en esta acción contra Ibec por violación de lo que dispone el Artículo 1483 del Código Civil, la contratista Ibec como constructora de las casas viene obligada a reparar su culpa por negligencia, para lo porvenir, restituyendo cada una de las casas de los demandantes, todas las cualidades de una buena construcción y el Tribunal puede condenarla a satisfacer lo que cueste restituirlas a las cualidades de una buena construcción."

No conforme las partes con el dictamen en cuestión, a solicitud de Tana e Ibec y de los reclamantes, expedimos los autos de revisión Núms. R-64-26 y R-64-30 y el auto de *certiorari* C-64-24, este último en relación con la concesión de ciertas costas y gastos de los reclamantes. A solicitud de Home Builders Association of Puerto Rico, autorizamos su comparecencia como *amicus curiae*. Discutiremos a continuación los distintos errores apuntados por las partes en cada uno de los referidos tres recursos en el mismo orden en que precedentemente los hemos mencionado.

—A—

*Errores apuntados por Tana-Ibec y
discutidos por el Amicus Curiae
Revisión R-64-26*

■ 1.—Resulta innecesario considerar los apuntamientos de las recurrentes relacionados con la sentencia dictada en contra de Tana pues concluimos que Ibec y Tana constituyen una sola entidad.

Al así concluir nos basamos en que no tan sólo las recurrentes y el *amicus curiae* admitieron que Tana e Ibec constituyen una sola entidad, sino además, en que el tribunal de instancia concluyó que ". . . Tana e Ibec son corporaciones

íntimamente vinculadas entre sí por comunidad de intereses siendo, a todos los efectos, Tana una subsidiaria de Ibec y estando la Junta de Directores de cada una de ellas compuesta de prácticamente los mismos oficiales." *San Miguel Fertilizer Corp.* v. *P.R. Drydock,* 94 D.P.R. 424 (1967) ; *J. E. Candal & Co.* v. *Rivera,* 86 D.P.R. 508 (1962). Véanse, además, *Licorería Trigo, Inc.* v. *Srio. de Hacienda,* 94 D.P.R. 270 (1967) ; *South P.R. Sugar Corp.* v. *Junta Azucarera,* 88 D.P.R. 43 (1963).

Además, como indican las recurrentes, los reclamantes no pueden recobrar tanto de Tana como de Ibec por los mismos daños, o sea, por los defectos de construcción en las casas que Ibec construyó y a través de Tana vendió a los reclamantes. Haremos referencia a las recurrentes en lo sucesivo como una sola entidad designada Tana-Ibec.

2.—Apunta Tana-Ibec que "[l]a sentencia es errónea en cuanto declara con lugar contra Ibec las demandas en los casos consolidados y la condena a resarcir a los demandantes daños y perjuicios basados en la alegada ruina de las casas en la Urbanización Highland Park." Añade el *amicus curiae* que la responsabilidad de Tana-Ibec como la constructora de las referidas viviendas, con respecto a los defectos en cuestión es la de un vendedor de dichas propiedades; que el tribunal a quo incurrió en error al concluir que las imperfecciones objetadas constituyen vicios de construcción y al responsabilizar al contratista por vicios aparentes de la obra manifiestos en el momento de la entrega.

En apoyo de este apuntamiento informa Tana-Ibec que las reclamaciones contra Ibec y la sentencia recurrida están basadas en el Art. 1483 del Código Civil (31 L.P.R.A. sec. 4124; (²) que la acción contra Ibec es *ex contractu* y no *ex*

---

(²) Es interesante notar que la responsabilidad por defectos de construcción es antiquísima. Hace 4,000 años el Código de Hammurabi disponía sobre el particular lo siguiente:

"229. Si un arquitecto ha construído una casa para alguien y no la

*delicto*, pues está contenida dentro de las disposiciones del Código Civil con respecto al arrendamiento de obras y servicios; que la acción provista por el Art. 1809 del referido código, contra el arquitecto o constructor (31 L.P.R.A. sec. 5148) (³) corresponde a un tercero no vinculado por sí o a través de quien adquiere por una relación contractual con el arquitecto o contratista que no es la situación que nos ocupa; que las casas no se han arruinado ni en todo ni en parte, de acuerdo con lo resulto en *Géigel* v. *Mariani*, supra; que no se probó la existencia de "vicios de construcción"; que no hubo infracción del contrato de construcción y que las agencias gubernamentales encargadas de la inspección y supervisión de las obras aprobaron las construcciones.

El juez sentenciador concluyó que "los vicios o defectos de construcción que existían en las casas de los demandantes, según éstos surgen de la prueba, son vicios o defectos que exceden la medida de las imperfecciones que cabe esperar en una construcción de hormigón", medida ésta que establecimos en *Géigel*, supra. La prueba demostró, en particular las conclusiones de hecho adicionales del juez sentenciador como resultado de su inspección ocular, que las viviendas de los reclamantes adolecían de tal cantidad de filtraciones por los

---

ha hecho sólida, si la casa se derrumba y mata al propietario, este arquitecto merece la muerte."

"230. Si mata al hijo del propietario, se matará al hijo del arquitecto."

"231. Si mata a un esclavo del propietario, el arquitecto entregará esclavo por esclavo al propietario."

"232. Si arruina su haber, todo lo que ha perdido deberá ser compensado, y por no haber construído sólidamente la casa que ha construído y que se ha derrumbado, volverá a levantar la casa a sus expensas."
Véase Traducción de dicho Código al español del Profesor Gabriel Franco, publicada en la *Revista de Ciencias Sociales de la Universidad de Puerto Rico*, págs. 331 y ss. (1962).

(³) El Art. 1809 del Código Civil lee así:

"Si el daño de que tratan las dos secciones anteriores resultare por defecto de construcción, el tercero que lo sufra sólo podrá repetir contra el arquitecto, o en su caso, contra el constructor, dentro del tiempo legal."

techos, tal multiplicidad de grietas y desprendimientos en techos, plafones y paredes, y tales defectos en puertas y ventanas, que debemos concluir que en conjunto caen bajo la definición de vicios o defectos de construcción previamente señalada.

■ Indicamos en *Géigel,* supra, que la responsabilidad del constructor por tales vicios de construcción no se limita a la ruina total de lo edificado sino que es responsable también por la ruina parcial. En dicho caso concluimos que grandes, serias y continuas filtraciones en un techo o azotea de hormigón que han dañado los plafones de la casa y la pintura de sus paredes establece el estado ruinoso a que se refiere el Art. 1483. En el caso ante nos, el estado ruinoso de muchas de las casas era aún más patente pues no tan sólo consistió de filtraciones sino de otros vicios, previamente relacionados, todos los cuales eran vicios o defectos ocultos como se requiere, según dijimos en *González* v. *Agostini,* 79 D.P.R. 510 (1956), con excepción de los defectos en las losetas del piso.

■ En cuanto a los defectos que no constituyen los vicios ocultos de construcción a que se refiere el Art. 1483, la prueba es clara al efecto de que Tana-Ibec convino en repararlos; que trató de cumplir con este compromiso en varias ocasiones y no lo logró, por lo que subsiste su obligación al efecto.

■ No podemos convenir con el *amicus curiae* en que la responsabilidad del constructor en este caso es la de un vendedor porque proporcionó materiales y trabajo en relación con la construcción de viviendas para ser vendidas y, por existir una situación real de identidad entre Tana e Ibec, proveyó, además, los solares en que las edificaciones se construyeron; que en efecto es una constructora vendedora. Convenimos con el Profesor Velázquez cuando al respecto dice:

". . . Este razonamiento debe rechazarse, en vista de que no tiene en cuenta la circunstancia de que el contratista, al reali-

zar una construcción, está en el deber de aportar todos los cuidados y todas las precauciones que en derecho deben esperarse de él por razón de su profesión. Y como es precisamente sobre esta idea, a la cual se vinculan consideraciones de orden público, que descansa la disposición del artículo 1483, sería contrario a su espíritu restringir su aplicación al caso en que el contratista haya edificado sobre terreno suministrado por el propietario." Velázquez, *Responsabilidad por los Defectos en las Edificaciones,* 20 Rev. Jur. U.P.R., pág. 13, cita precisa a la pág. 26.

3.—"La sentencia es adicional y especialmente errónea en cuanto concluye que la recurrente Ibec fue negligente en la construcción de las casas del proyecto 'Highland Park' al usar el tipo de techo prefabricado (Pre-Cast) en las mismas."

■ No tenemos duda de que Tana-Ibec fue negligente en la construcción de las casas en cuestión. Las siguientes circunstancias justifican esta conclusión:

a) el techo prefabricado junto con capa inferior de hormigón celular no se había usado antes en Puerto Rico en la construcción en serie de un gran número de viviendas de manera que no se tenía experiencia suficiente con ese tipo de construcción. El resultado fue que por falta de experiencia o de cuidado hubo filtraciones considerables a través de muchas losas y más por las juntas entre aquéllas e innumerables grietas en el techo, en el plafón y en las paredes. Hubo prueba de que estas grietas se debieron a diferentes causas. El perito Martín testificó que las de los techos se debieron en parte a esfuerzos de manipulación en el momento de colocarse las losas prefabricadas en su lugar. Las existentes en las juntas se debieron a movimientos de una losa en relación con otra. El perito Muratti testificó que "estas pequeñas imperfecciones . . . han resultado ya bien por la moldeada de los hormigones o ya bien en la operación de coger estos techos ya fraguados y colocarlos en las casas . . ."; las de los plafones, a la diferencia de material que existe entre el hormigón normal de las viguetas y el hormigón celular que se encuentra entre ellas y que fueron fraguados conjuntamente

en el proceso de prefabricación. Otras grietas en las paredes, cercanas a la unión de la pared con el techo, se debieron a los esfuerzos de arrastre que provocan las losas prefabricadas y otras también a esfuerzos de manipulación.

El perito Amerikian testificó que es normal que un 5% de los techos que se construyan filtren. El perito Muratti, testificó que de 51 casas que él examinó, nueve mostraban señas de filtraciones por el techo, es decir, un 17.65%, o sea, que de acuerdo con esta declaración la incidencia de filtraciones por el techo es mucho mayor de lo que normalmente debía esperarse.

b) La montura defectuosa de los marcos de puertas y ventanas y el diseño defectuoso de puertas ciertamente no demuestran que la construcción se llevó a cabo con el debido celo, cuidado y pericia que debe esperarse en cualquier construcción corriente.

c) El hecho que en los pisos se noten gran número de losas rotas en las esquinas o sueltas y otras descoloridas demuestra que, o la constructora no usó el debido cuidado en comprar losetas de calidad aceptable o se las compró a un fabricante irresponsable o, en el caso de las que aparecen rotas o sueltas, no usó el debido cuidado en su colocación.

d) Las casas adolecían de un gran número de otras imperfecciones. Aparentemente no se hicieron reclamaciones por estas imperfecciones porque Tana-Ibec las corrigió con anterioridad a las demandas en estos casos.

e) El tribunal concluyó con fundamento en la prueba, que la separación de los alambres de acero que formaban una malla (*wire-mesh*) usada como refuerzo en las losas de los techos de las referidas casas era tres veces mayor que la separación recomendada por los peritos.

f) Los techos prefabricados fueron usados primeramente en la casa modelo. Ésta coló agua por el techo, y sin embargo, se usó el mismo tipo de techo en la construcción de las casas sin informar de ello a los reclamantes.

g) Según uno de los peritos de Tana-Ibec no se hicieron pruebas del hormigón de acuerdo con las prácticas y normas prescritas.

4.—Se alega que no procedía condenar a Tana-Ibec a pagar a cada dueño de las casas tipo Acapulco la suma de $550 y a cada dueño de las casas tipo Montecarlo la suma de $650 para la instalación de un *built-up roof* pues la prueba demostró que solamente un poco más de la mitad de las casas necesitaban protección adicional en sus techos. No es así. La prueba en cuanto a este defecto pudo ser en cierto modo conflictiva pero del examen del conjunto de la misma resulta evidente que hubo base en la prueba para sostener la determinación del tribunal de instancia en este particular.

Se apunta que los montos de las otras partidas de costos de reparaciones son exagerados y no están sostenidos ni se basan en la prueba de testigos periciales calificados para declarar sobre el costo de reparaciones en Puerto Rico; que un gran número de casas estaba en excelentes condiciones. Antes de seguir adelante es necesario puntualizar que (a) el tribunal de instancia puede hacer su propia apreciación de dicho costo pues la intervención de los peritos no constituye un juicio "sino sólo un dictamen", Scaevola, *Código Civil*, tomo 23, ed. 1906, pág. 625; cf. *Concepción Guzmán* v. *A.F.F.*, 92 D.P.R. 488 (1965); y (b) el juez sentenciador personalmente inspeccionó 48 casas y se estipuló que el resto de las mismas revelan una situación promedio a la revelada por dicha inspección ocular.

Las partidas de costos de las reparaciones a que se refiere el párrafo anterior no son exageradas y están basadas en la prueba presentada. La partida con respecto a la eliminación del cartón y la fijación o ajuste más sólido de marcos de puertas y ventanas es un poco más de la mitad del estimado del perito Martín; la partida determinada con respecto a los pisos es un poco más de una tercera parte del estimado de dicho perito; mientras que las que se determinaron con

respecto a grietas en paredes y para corregir y eliminar grietas y manchas del plafón y pintar lo corregido en plafones y paredes es sólo un poco más bajo del estimado de este perito.

A las casas de los reclamantes enumerados en el inciso (5) de la sentencia del tribunal de instancia como que no necesitan reparación y cambio de losetas, deben añadirse las de Milton Heath, Leonard Partridge, y el Dr. Salvador Hernández Oviedo, porque, como señala Tana-Ibec, así lo determinó dicho tribunal en sus conclusiones de hecho adicionales.

5.—Se imputa como error incurrido por el tribunal de instancia el que se condenase a Tana-Ibec a pagar $1,500 a unos reclamantes y $2,500 a otros, en concepto de daños y perjuicios como consecuencia de los vicios o defectos de construcción en sus respectivas propiedades.

Se arguye que las referidas concesiones son improcedentes tanto por concepto de daños punitivos como por razón de resarcimiento compensatorio por angustias y sufrimientos mentales; que en Puerto Rico no se ha autorizado por ley la concesión de daños punitivos, (⁴) y por lo tanto, el concederlos es improcedente; que en acciones basadas en, o derivadas de, una relación contractual o quebrantamiento de contrato no procede la confesión de daños por sufrimientos y angustias mentales. El *amicus curiae* en sus apartados quinto y noveno insiste en que la concesión de daños morales contra Tana-Ibec es improcedente porque la indemnización en *quanti minoris* incluye ya en la reducción del precio todo el resarcimiento por daños a que se tiene derecho por el comprador y por lo

---

(⁴) El Profesor Velázquez dice que "la jurisprudencia puertorriqueña no ha llegado aún a admitir la teoría de los *daños punitivos* consagrada por el Derecho angloamericano . . . . Parece que en el Derecho angloamericano, en que no se admite el daño moral, se justifica dicha teoría. Igual justificación no existe en el Derecho puertorriqueño." (Énfasis en el original.) Velázquez, *Las Obligaciones según el Derecho Puertorriqueño*, pág. 120. (Equity, ed. 1964.) Véanse, además, Hernández Usera, *Miguel vs. Hernáiz Targa* y la *Concesión de Daños Punitivos en Puerto Rico*, 4 Revista de Derecho, Legislación y Jurisprudencia, pág. 106 (1939–1940).

tanto no puede recobrar contra el contratista pues no hay más daños que recobrar y, además aun bajo los Arts. 1054, 1056 y 1057 del Código Civil (31 L.P.R.A. secs. 3018, 3020 y 3021) no se pueden recobrar tales daños de Tana-Ibec ya que no existía relación contractual entre ésta y los reclamantes.

■ No es necesario que resolvamos en esta ocasión la procedencia de daños punitivos en casos como éstos, pues es evidente de las determinaciones del juez sentenciador que la partida de $1,500 en unos casos y $2,500 en otros se concedieron por concepto de daños morales.

El examen que hemos hecho de la prueba nos convence que el juez sentenciador tenía amplia justificación para concluir que los reclamantes sufrieron daños morales. Es obvio que familias de recursos limitados que adquieren casas de nueva construcción, grandemente ilusionados por la oportunidad de hacerse de su propio hogar construido de un estilo arquitectónico y de una terminación aceptable, según lo podían prever de su examen de la casa modelo, se sintieran frustrados y humillados, fueran presas de hondas preocupaciones y angustias, llegaran a temer por la inestabilidad de la construcción y por la salud de sus hijos, y sufrieran muchos y sustanciales inconvenientes (como admitió en varias de sus circulares dirigidas a los reclamantes uno de los ejecutivos de Tana-Ibec) por el doloroso cuadro de defectos en sus casas que hemos descrito previamente.

■ Se plantea, sin embargo, que tales daños no son recobrables de Tana-Ibec. Creemos que sí. Hemos demostrado anteriormente que las casas de los reclamantes adolecen de los referidos defectos y que Tana-Ibec como el constructor de las mismas responde de los daños y perjuicios que causare. Se alega que la responsabilidad del contratista bajo el Art. 1483 del Código Civil no incluye los daños morales por tres razones, a saber:

a) dicha responsabilidad está limitada a la reparación de los defectos o al pago de una indemnización que se mide por el costo de la reparación más los gastos suplementarios que puedan habérsele ocasionado al perjudicado.

b) dicha responsabilidad del contratista proviene de una relación contractual y como no existía tal relación entre Ibec y los reclamantes no procede la reclamación de los referidos daños bajo los Arts. 1054, 1056, 1057, 1059 y 1060 del Código Civil (31 L.P.R.A. secs. 3018, 3020, 3021, 3023 y 3024). [5]

c) que en el caso de que la responsabilidad provenga de una relación contractual la misma no incluye los daños morales.

---

[5] Los Arts. 1054, 1056, 1057, 1059 y 1060 del Código Civil disponen lo siguiente:

*Art. 1054.*

"Quedan sujetos a la indemnización de los daños y perjuicios causados, los que en el cumplimiento de sus obligaciones incurrieren en dolo, negligencia o morosidad, y los que de cualquier modo contravinieren al tenor de aquéllas."

*Art. 1056.*

"La responsabilidad que proceda de negligencia es igualmente exigible en el cumplimiento de toda clase de obligaciones, pero podrá moderarse por los tribunales según los casos."

*Art. 1057.*

"La culpa o negligencia del deudor consiste en la omisión de aquella diligencia que exija la naturaleza de la obligación y corresponda a las circunstancias de las personas, del tiempo y del lugar.

"Cuando la obligación no exprese la diligencia que ha de prestarse en su cumplimiento, se exigirá la que correspondería a un buen padre de familia."

*Art. 1059.*

"La indemnización de daños y perjuicios comprende, no sólo el valor de la pérdida que haya sufrido, sino también el de la ganancia que haya dejado de obtener el acreedor, salvas las disposiciones contenidas en las secciones siguientes."

*Art. 1060.*

"Los daños y perjuicios de que responde el deudor de buena fe son los previstos o que se hayan podido prever al tiempo de constituirse la obligación y que sean consecuencia necesaria de su falta de cumplimiento.

"En caso de dolo responderá el deudor de todos los que conocidamente se deriven de la falta de cumplimiento de la obligación."

Es cierto que en *Soegard* v. *Concretera Nacional, Inc.,* 88 D.P.R. 179 (1963) resolvimos "que generalmente no son recobrables los daños mentales o morales basados en un incumplimiento de un contrato o en destrucción o pérdida de propiedad" por no ser previsibles. Sin embargo, en *Sociedad de Gananciales* v. *Fuentes Fluviales,* 91 D.P.R. 96 (1964), resolvimos que "no es errónea, la sentencia que condena a la recurrente a pagar los daños sufridos (sufrimientos o angustias mentales) por los demandantes como consecuencia de su morosidad en el cumplimiento de su obligación." Dicha obligación era de naturaleza contractual. En *Camacho* v. *Iglesia Católica,* 72 D.P.R. 353 (1951), resolvimos que los daños por concepto de sufrimientos mentales por la profanación de tumba como resultado del quebrantamiento de un contrato de venta de nicho en el cementerio son compensables por ser previsibles ya que "son claramente consecuencia necesaria de la falta de cumplimiento del contrato". En *Díaz* v. *Palmer,* 62 D.P.R. 111 (1943), sostuvimos que no era compensable una partida de daños por sufrimientos y angustias mentales causados con motivo de la destrucción—por incendio—de una casa de madera del demandante. Pero en este caso se trataba de una casa cerrada, no ocupada por su dueño que era el reclamante de tales daños. Por el contrario, en el caso ante nos los reclamantes, con excepción de Robert E. Trent, Luis González Quiñones, Germán Sigurany, José A. Rivera, Ernesto Reyes Arnaldi, José Castellanos Lloréns, Manuel A. Fernández, José Ramón González y Fernando Barron, padecieron los sufrimientos y angustias mentales motivados por los defectos de construcción directamente mientras vivían en sus respectivos y recién adquiridos hogares. En el caso de los reclamantes que acabamos de enumerar, los daños morales los sufrieron los compradores de Tana-Ibec que luego vendieron sus propiedades a estos reclamantes que fueron sustituidos en las causas bajo consideración en lugar de los compradores originales. En cuanto a la procedencia de las recla-

maciones de éstos, véase nuestra discusión y conclusiones en el apartado A-7 de esta opinión. La multiplicidad de defectos en las casas fue indudablemente la causa directa de tales daños. Creemos que bajo los hechos de estos casos, era previsible que la construcción negligente de las casas ocasionase angustias y sufrimientos mentales a las familias que las compraron de Tana-Ibec. Ellas esperaban, como tenían derecho a esperar, que las casas se hubiesen construido de acuerdo con prácticas aceptables de la ingeniería y de la calidad de la casa modelo que se les mostró, en adición a que la construcción se llevase a cabo sustancialmente de acuerdo con los planos y especificaciones aprobados. De manera que si la responsabilidad bajo el Art. 1483 proviene de una relación contractual, el contratista es responsable, bajo las circunstancias de este caso, de los daños morales ocasionados por su negligencia en el cumplimiento de su obligación de construir tales casas.

Con respecto a la concesión de daños morales resultantes del incumplimiento de las obligaciones, nos dice Castán que:

"Pero no faltan civilistas que entienden—con razón, a nuestro juicio—que, admitido el daño moral como susceptible de indemnización en el campo extracontractual, no se ve razón por la que haya de ser excluído del campo de las obligaciones contractuales.

En realidad, los argumentos que suelen invocarse contra la indemnización del daño moral pueden afectar por igual a la culpa contractual que a la extracontractual, y son, casi siempre, más que de fondo, de carácter técnico y sistemático. La discusión gira, en gran parte, sobre si el daño material y el daño moral constituyen un solo concepto o dos conceptos diferentes; habiendo de entenderse, en este último sentido, como opina, por ejemplo, Pacchioni, que 'solo el daño patrimonial puede ser *resarcido,* mientras que los daños morales no patrimoniales no son resarcibles y sí sólo en algún modo *compensables'.* [Énfasis en el original.] Sin dar gran importancia al debate en este plan conceptual, *se puede llegar a las conclusiones siguientes: 1ª Que es de justicia la reparación o compensación de los daños morales, ya pueda encuadrarse dentro de las normas legales de la indem-*

*nización de daños y perjuicios, o ya se acoja, en cuanto ésta no
sea aplicable, a los principios generales del Derecho.* [Énfasis
nuestro.] 2ª Que, de todos modos, parece indudable que la repa-
ración de los daños morales que no se traducen en quebranto
material inmediato ha de ser sometida a un régimen jurídico
distinto al de aquel que gobierna los daños propiamente patri-
moniales: los requisitos que afectan al nexo causal y a la prueba
de los daños morales han de ser tratados con menos severidad
que cuando se trata de daños materiales, y ha de ser concedido
a los Tribunales un amplio arbitrio para su apreciación." Castán,
*Derecho Civil Español, Común y Foral,* Tomo III, *Derecho de
Obligaciones,* Novena Ed. (1958), págs. 177–179.

Jaime Santos Briz en su obra, *Derecho de Daños* (1963),
págs. 120–125; y Lino Rodríguez Arias en la suya, *Derecho
de Obligaciones,* (1965), pág. 243, comparten ese criterio.
Véanse, además, Borrell y Soler, *Cumplimiento, Incumpli-
miento y Extinción de las Obligaciones Contractuales Civiles,*
(1954), págs. 117–120, y Borrell y Soler, *Derecho Civil Espa-
ñol,* Tomo 3ro. (1955), pág. 64; Planiol y Ripert, *Treatise on
the Civil Law,* traducido por el Louisiana State Law Insti-
tute, Vol. 2, Part 1, Ed. 11 (1939), págs. 152–153; Josserand,
*Derecho Civil,* Tomo II, Vol. I (1950), págs. 508–509; Spota,
*Tratado de Derecho Civil,* Tomo I, Vol. 2 (1960), págs.
221–222.

▮ Se arguye que los daños recobrables bajo el Art. 1483
están limitados a los indicados en el inciso (a) anterior.
Nada encontramos en derecho que exija concluir que en su
reclamación contra Tana-Ibec, los reclamantes están limi-
tados al remedio provisto por el Art. 1483. En las demandas
en estos casos se alegó que los reclamantes sufrieron daños
y perjuicios y sufrimientos mentales y emocionales al ver
sus residencias en situación ruinosa. La prueba aducida
demostró el alcance de tales daños y que la causa legal de
éstos fue la negligencia de Tana-Ibec. Por lo tanto, en vista
de lo expuesto y de lo provisto en las Reglas Núms. 6.6 y

13.2 de las Reglas de Procedimiento Civil, (⁶) resolvemos que Tana-Ibec es responsable de los daños morales, previsibles según indicamos previamente, sufridos por los reclamantes que originalmente compraron las casas de Tana-Ibec, así como de los daños materiales consistentes en el costo determinado de reparar los vicios o defectos de construcción en cada una de las casas compradas por los reclamantes.

6.—Es errónea adicionalmente la sentencia recurrida con respecto a Tana-Ibec pues no tomó en consideración, para reducir el montante de los resarcimientos, el hecho de que dichos reclamantes y las personas de quienes algunos de ellos adquirieron las casas, nada han hecho ni antes ni después de iniciados los pleitos consolidados para evitar el empeoramiento de la situación de las mismas, primero al rechazar las ofertas de Tana-Ibec de hacer las reparaciones necesarias y, segundo, al no efectuarlas ellos mismos.

Arguye Tana-Ibec que en repetidas ocasiones ofreció a los reclamantes hacer en sus casas los arreglos necesarios

---

(⁶) Las referidas Reglas 6.6 y 13.2 disponen que:

*Regla 6.6*

"Todas las alegaciones se interpretarán con el propósito de hacer justicia."

*Regla 13.2*

"Cuando con el consentimiento expreso o implícito de las partes se sometan a juicio cuestiones no suscitadas en las alegaciones, aquéllas se considerarán a todos los efectos como si se hubieran suscitado en las alegaciones. La enmienda de las alegaciones que fuere necesaria para conformarlas a la evidencia a los efectos de que las alegaciones reflejen las cuestiones suscitadas, podrá hacerse a moción de cualquiera de las partes en cualquier momento, aun después de dictarse sentencia; pero la omisión de enmendar no afectará el resultado del juicio en relación con tales cuestiones. Si se objetare a la evidencia en el juicio por el fundamento de ser ajena a las cuestiones suscitadas en las alegaciones, el tribunal podrá permitir las enmiendas y deberá hacerlo liberalmente, siempre que con ello se facilite la presentación del caso y la parte que se oponga no demuestre a satisfacción del tribunal que la admisión de tal prueba perjudicaría su reclamación o defensa. El tribunal podrá conceder una suspensión para permitir a la parte opositora controvertir dicha prueba." Véase *Castillo* v. *Chico Padró*, Sentencia de 9 de octubre de 1963, *Certiorari* Núm. CE-63-33.

permanentes, hecho que se comprobó de acuerdo con la conclusión de hecho Núm. 40 de la sentencia del tribunal de instancia; que los reclamantes lo admitieron según el reclamante Partridge; y que éstos rechazaron la oferta y no hicieron tales reparaciones por su cuenta, según el testimonio del reclamante Ruby; que en el supuesto de que no hubiesen deseado que Tana-Ibec las hiciesen porque anteriormente trató y no lo logró como lo determinó el juez sentenciador en su conclusión de hecho Núm. 22, los reclamantes debieron realizar la reparación por su cuenta; que no puede argüirse que no estaban en condiciones de hacerlo, pues la prueba demostró que algunos reclamantes hicieron adiciones importantes en sus casas, entre éstos el reclamante Oscar Padró Collado quien hizo una ampliación a su casa; que lo expuesto con relación a los tres reclamantes que acabamos de mencionar es extensivo a los demás por estipulación de las partes; que de ser responsable Tana-Ibec bajo los hechos en estos casos, dicha responsabilidad debe quedar limitada a la que resultaba de la situación existente una vez entregadas las casas y que no debe ser responsable de daños mayores o adicionales ocasionados por la propia incuria de los reclamantes; que había base en la prueba para limitar la responsabilidad pues (a) el ingeniero Vivoni testificó que de haberse realizado las reparaciones oportunamente habrían costado un 30% del costo a la fecha de su testimonio y (b) el testigo de los reclamantes, ingeniero Martín, testificó que los costos de materiales aumentaron un 4% desde que examinó las casas en mayo de 1962 hasta la fecha de su testimonio y que seguirían subiendo y que dichos costos habían subido aun más a la fecha de la inspección ocular realizada por el juez sentenciador a base de la cual éste hizo su determinación de las cuantías de que era responsable Tana-Ibec; que en adición a haber subido los costos, también fueron aumentando la importancia y la gravedad de los alegados defectos. En *Géigel* v. *Mariani*, supra, citamos el caso de *Limjap* v.

*J. Machuca & Co.*, 38 Jur. Fil. 478, 481 (1918), en que se dice que es deber de los damnificados por defectos de un edificio ejercer el debido cuidado y diligencia para evitar pérdidas y aminorar la cuantía de los daños y perjuicios que provengan de los mismos. Véanse, además, *Franceschi* v. *Rivera Echevarría*, 94 D.P.R. 585 (1967) ; *Díaz, etc.* v. *Quetglas y Acevedo*, Sentencia de 28 de febrero de 1964; *Stella, hoy su Sucn.* v. *Municipio*, 76 D.P.R. 783, 796 (1954) ; *Palmer* v. *Barreras*, 73 D.P.R. 278, 284–285 (1952) ; *Ortiz* v. *McCormick Steamship Co.*, 57 D.P.R. 560, 566 (1940) ; *López* v. *American Railroad Co. of P.R.*, 50 D.P.R. 1, 29–30 (1936).

El récord demuestra que desde la fecha en que los reclamantes ocuparon sus respectivas casas, Tana-Ibec estuvo realizando reparaciones en las mismas, con efectividad en el caso de algunos defectos e infructuosamente en el caso de otros hasta que los reclamantes se convencieron de la inefectividad de tales gestiones y no las permitieron más. No hubo prueba de que los reclamantes estuviesen en condiciones económicas de realizar las reparaciones en cuestión. Oscar Padró Collado sólo admitió haber construido un cuarto adicional. Tanto este reclamante como otros, testificaron que no hicieron las reparaciones en cuestión porque Tana-Ibec había tratado de hacerlas y tanto las grietas como las filtraciones volvieron a surgir por lo que entendieron que filtraciones y grietas no podían corregirse excepto mediante la remoción total del techo y la construcción de otro como recomendó y así testificó el perito Martín en su testimonio directo.

Es evidente del récord que la prueba de Tana-Ibec en que basa este apuntamiento es exigua, vaga, imprecisa y especulativa y que, por el contrario, los reclamantes no tenían motivos fundados para no tomar medidas inmediatas para corregir los defectos o para evitar que éstos se agravasen, si es que en realidad se agravaron pues tal situación no se demostró por, ni puede inferirse con relativa certeza de la prueba al efecto aducida.

7. "La sentencia es adicional y especialmente errónea en cuanto a ambas recurrentes Tana' e Ibec al declarar con lugar las reclamaciones de los demandantes, Robert E. Trent, Luis González Quiñones, Germán Sigurany, José A. Rivera, Ernesto Reyes Arnaldi, José Castellanos Lloréns, Manuel A. Fernández, José Ramón González y Fernando Barron."

Los reclamantes en cuestión adquirieron sus casas luego de estar pendiente el litigio iniciado por los compradores originales de las mismas. En el caso de dos de los referidos nueve segundos adquirentes, aquí reclamantes, se hizo constar la cesión de la correspondiente causa de acción en sus escrituras de compra. En todos estos casos se radicó una moción para sustituir al segundo adquirente en lugar del comprador original, y la misma fue notificada a Tana-Ibec, según lo dispone la Regla 22.3 de las Reglas de Procedimiento Civil. (7) La orden del tribunal de instancia autorizando la sustitución no fue objetada por Tana-Ibec. Además, ésta suscribió, en 20 de enero de 1964, una estipulación relacionándo los nombres de los referidos nueve adquirentes subsiguientes.

Se arguye que para estos cesionarios los defectos en cuestión no eran ocultos cuando recibieron las casas; que la acción de saneamiento de los referidos cesionarios es contra las personas que les vendieron; que si tuviere tal acción contra el primer vendedor en este caso, caducó pues ya había expirado el período de seis meses para radicarla; que no procede la acción bajo el Art. 1483 contra Tana-Ibec en estos casos porque de estar en ruinas las casas, la ruina no ocurrió estando ya los nuevos adquirentes en posesión de sus respectivas casas; que al adquirir sus casas, únicamente

---

(7) La Regla 22.3 dispone:

"En caso de cualquier cesión de interés, podrá continuarse el pleito por o contra la parte original, a menos que el tribunal, previa solicitud al efecto, disponga que el cesionario sea sustituido en el pleito o acumulado a la parte original. La solicitud será notificada conforme se dispone en la Regla 22.1."

adquirieron el título de las mismas con todos los derechos inherentes como dueños de las mismas, pero no adquirieron los derechos personales de los anteriores dueños en ausencia de una estipulación específica sobre ello, siendo la acción de los anteriores dueños de naturaleza personal no transmisible como lo es la reclamación por daños y angustias mentales; que lo dicho es cierto también en cuanto a los casos de los cesionarios Robert Trent y Germán Sigurany, pues la cesión de la acción pendiente estipulada en sus escrituras de compra no expresa el precio o consideración de la cesión por lo que se le estará negando a Tana-Ibec su derecho de extinguir el crédito litigioso mediante el rembolso de lo que se pagó por el mismo, según lo provee el Art. 1425 del Código Civil (31 L.P.R.A. sec. 3950).

El Art. 1065 del Código Civil (31 L.P.R.A. sec. 3029), dispone que "Todos los derechos adquiridos en virtud de una obligación son transmisibles con sujeción a las leyes, si no se hubiese pactado lo contrario." No existe pacto alguno entre las partes que restrinja la cesión de los derechos de los compradores originales en estos casos. La cesión de crédito litigioso no está entre los contratos cuyo otorgamiento debe constar en documento público a que se refiere el Art. 1232 del Código Civil (31 L.P.R.A. sec. 3453). La cesión en estos casos cumple con los requisitos de la referida Regla 22.3, inclusive el de notificación a Tana-Ibec en este caso. No se necesitaba el consentimiento de Tana-Ibec para las transferencias de los referidos créditos. *Morales* v. *Blanco*, 15 D.P.R. 237 (1909). Estas causas son transmisibles, pues no son derechos personalísimos como lo son, entre otros, el uso, la habitación, la patria potestad, los alimentos, la tutela y el testamento. *Robles Menéndez* v. *Tribunal Superior*, 85 D.P.R. 665 (1962). El efecto de la cesión en estos casos ha sido la sustitución de los compradores originales por otros con respecto al mismo crédito, perdurando la misma obligación con todos sus derechos accesorios. Tana-Ibec responde a estos ce-

sionarios de la misma obligación, de manera que ésta no varía por razón de la cesión, ni en su naturaleza ni en su extensión, ni en su contenido. Se conservan, por supuesto, las excepciones inherentes a la cosa, es decir, las defensas disponibles en casos como éstos, que la recurrente Tana-Ibec hubiera podido oponer a los compradores originales. De Diego y Gutiérrez, Felipe Clemente, *Transmisión de las Obligaciones* (1912), pág. 126. Las causas en cuestión pudieron haber continuado a nombre de los compradores originales como lo dispone la referida Regla 22.3, a pesar de éstos haber vendido las casas. *Méndez* v. *Bowie*, 118 F.2d 435 (1st Cir. 1941). De manera que no puede argüirse, como pretende Tana-Ibec, que al vender las casas se extinguieron las causas incoadas por los compradores originales de manera que su subsiguiente cesión en estos casos resulte inefectiva. La realidad es que el trámite procesal de sustitución en nada afecta los derechos sustantivos de las partes.

 Si bien en el caso de *Zalduondo* v. *Iturregui*, 83 D.P.R. 1 (1961), se trataba de la sustitución del demandado como comprador subsiguiente de una propiedad sujeta a la acción real de retracto por tratarse de un condominio, no es menos cierto que de acuerdo con la doctrina establecida en el mismo, cuando en efecto se transmite un derecho, el adquirente queda en la misma posición que su causante y por lo tanto le aprovechan las gestiones realizadas en tiempo por el anterior dueño, así como sus derechos y queda sujeto a las mismas responsabilidades y defensas que pudieran reclamarse o invocarse en contra de aquél.

En vista de lo expuesto, el carácter de oculto que los defectos o algunos de ellos pudieran tener en relación con los compradores originales subsiste al sustituirse en lugar de éstos a los compradores subsiguientes y continúa dando base para la acción bajo el Art. 1483 del Código Civil. Sin embargo, concluimos que los compradores subsiguientes no pueden responsabilizar a Tana-Ibec por daños morales oca-

sionados por su negligencia como constructora ya que ellos no los pudieron sufrir pues compraron con conocimiento de las reclamaciones ya hechas por los compradores originales a Tana-Ibec y de los defectos de construcción en que los mismos se basaban.

 Carece de mérito la defensa de que por falta de fijarse precio a la cesión, Tana-Ibec no pudo ejercer el derecho de retracto de los referidos créditos litigiosos, de acuerdo con el Art. 1425 del Código Civil, pues tal derecho caducó al no ejercitarlo mediante moción al efecto, dentro del término de nueve días fijado por la referida disposición. En dicha moción podían haber solicitado se les informase el precio de las cesiones e indicar su propósito de pagar dicho precio previa su comprobación.

8. "La sentencia es errónea además en cuanto concede a Enrique Díaz saneamiento contra Tana y daños y perjuicios contra Ibec no obstante no ser dicho Enrique Díaz demandante ni figurar como parte en ninguno de los casos consolidados."

Tiene razón Tana-Ibec. Aunque es cierto que desfiló prueba en las vistas celebradas en estos casos con respecto a los defectos existentes en la residencia vendida por Tana-Ibec a Enrique Díaz, y la misma fue inspeccionada por el juez sentenciador y fue objeto de determinaciones de hecho adicionales específicas por el tribunal de instancia, y dicho reclamante fue incluido en la relación de los reclamantes que el tribunal de instancia hizo en su sentencia, no es menos cierto que en el récord no aparece demanda alguna radicada por este reclamante en contra de Tana-Ibec y que por lo tanto las partes, así como el tribunal a quo, incurrieron en error al considerar la acción de Enrique Díaz, ya que la misma nunca se inició. Regla Núm. 2 de las Reglas de Procedimiento Civil.([8])

---

([8]) La Regla Núm. 2 provee que:
"Un pleito se inicia con la presentación de una demanda en el tribunal."

9. "La sentencia es errónea también al no condenar en costas y honorarios de abogado a la demandante Julia M, Benítez, cuya reclamación fue desestimada."

■ El tribunal de instancia no indicó en su sentencia la razón por la cual desestimó el caso de Julia M. Benítez. Se arguye que hizo esta determinación porque la reclamante no probó ser dueña de la casa objeto de su causa y que en tal virtud era mandatorio condenarla al pago de las costas y además al pago de honorarios de abogado.

La Regla 44.4(a) (⁹) de las Reglas de Procedimiento Civil dispone que las costas le serán concedidas a la parte a cuyo favor se resuelva el pleito. Por lo tanto, en una acción civil ordinaria como es ésta, la imposición de costas es mandatoria. *Peralta* v. *Peninsular Life Ins. Co.*, Per Curiam resuelto en 4 de junio de 1964 escolio 1. De manera que el tribunal sentenciador incidió al no imponerlas. Por lo tanto debe modificarse la sentencia en este caso en ese sentido. *Colón* v. *Asociación Cooperativa Lafayette*, 67 D.P.R. 271 (1947); *Feliciano* v. *Antonio Roig*, 56 D.P.R. 719 (1940).

■ La Regla 44.4(d) de las Reglas de Procedimiento Civil dispone que cuando una parte haya procedido con temeridad, el tribunal deberá imponerle en su sentencia el pago de una suma por concepto de honorarios de abogado. El tribunal de instancia no hizo pronunciamiento específico en cuanto a temeridad y por lo tanto, vistas las circunstancias del caso, no constituyó error el dejar de imponer el pago de honorarios de abogado.

10. "La sentencia es errónea también en cuanto condena a ambas demandadas, aquí recurrentes, a satisfacer la suma de $300.00 en cada caso para honorarios de abogado de los demandantes o sea en total la suma de $24,900.00."

---

(⁹) La Regla 44.4(a) dispone:

"(a) *Su concesión.* Las costas le serán concedidas a la parte a cuyo favor se resuelva el pleito o se dicte sentencia en apelación, excepto en aquellos casos en que se dispusiera lo contrario por ley o por estas reglas."

En apoyo de este apuntamiento se arguye que Tana-Ibec no fue temeraria al defenderse de estas reclamaciones, pues:

(a) El importe de tales reclamaciones de acuerdo con la demanda era de cinco veces el importe de la sentencia que aun reducida peca de errónea por excesiva.

(b) Tana-Ibec fue arrastrada a estos pleitos festinadamente no obstante haber estado siempre y manifiestamente dispuesta, antes y después de radicadas las demandas, a rescindir las ventas, o, en su defecto, hacer las reparaciones y arreglos necesarios en las casas.

(c) Los honorarios fijados son excesivos pues debido a la consolidación de los casos, a solicitud de Tana-Ibec, quedó en realidad uno solo ya que las cuestiones de derecho envueltas en el litigio son esencialmente comunes a todos los casos. Las cuestiones de hecho fueron reducidas y limitadas por estipulaciones con respecto a la prueba.

Los primeros dos fundamentos carecen de mérito. En *Vda. de Passalacqua* v. *Cancel*, 90 D.P.R. 501 (1964), reiteramos nuestro anterior dictamen en *Soto* v. *Lugo*, 76 D.P.R. 444 (1954). A ese efecto apuntamos que "el hecho de que se conceda por concepto de daños una suma sustancialmente inferior a la solicitada en la demanda no demuestra la ausencia de temeridad, y dijimos que, una parte demandada que al radicar su contestación niegue la alegación de negligencia en el caso, prolongando con ello la duración del litigio y obligando a la parte actora a continuar el litigio con los consiguientes gastos, molestias y trabajo que esto origina, es temeraria, y no deja de serlo porque días antes de la vista del caso admita su responsabilidad y limite la controversia a la cuantía de la indemnización." En estos casos Tana-Ibec no se limitó a litigar la cuantía de su responsabilidad sino que negó que la hubiese contraído; negó el derecho de los reclamantes a reclamar y alegó que de haber tenido los reclamantes dicho derecho éste había caducado,

e interpuso varias otras defensas. De manera que procede concluir que hubo la temeridad requerida y, por lo tanto, el tribunal estaba obligado a condenarla al pago de una suma por concepto de honorarios de abogado. Regla 44.4(d) de las de Procedimiento Civil. *U.S. Casualty Co.* v. *Tribunal Superior*, 89 D.P.R. 785 (1964); *Ortiz* v. *Martorell*, 80 D.P.R. 544, 552 (1958); *Prado* v. *Quiñones*, 78 D.P.R. 322 (1955); *Sucn. Trías* v. *P.R. Leaf Tobacco Co.*, 59 D.P.R. 229 (1941); *Acha* v. *Nevares*, 59 D.P.R. 235, 248 (1941).

Concluimos, sin embargo, que la condena en cuestión es excesiva y, por lo tanto, se rebajará la misma a la suma de $200 en cada caso. Cf. *Seda* v. *Miranda Hnos. & Co.*, 88 D.P.R. 355 (1963).

—B—

*Errores apuntados por los reclamantes*
*Recurso R-64-30*

A pesar de que la sentencia les favorece, los reclamantes recurren ante nos imputándole al tribunal de instancia la comisión de tres errores que pasamos a considerar:

1.—Que el juez sentenciador erró al conceder un sólo *built-up roof* para todas las casas salvo dos que ya lo tenían, cuando debió haber concedido cinco adicionales.

Arguyen los reclamantes que el tribunal de instancia determinó que Tana-Ibec "siempre albergaron duda razonable de que los techos se colaran"; que "sabían además que ese techo que usaron en la casa modelo había colado agua"; y que "los defectos de construcción en todas y cada una de las casas envueltas en este litigio excedieron la medida de las imperfecciones que cabe esperar en una construcción de hormigón"; que, por lo tanto, debe aplicarse a estos casos la regla que establecimos en *Géigel* v. *Mariani*, supra, al efecto de que "La construcción defectuosa impone al arquitecto o al contratista la obligación de reparar su culpa para lo por-

venir restituyendo al edificio todas las cualidades de una buena construcción"; que "para lo porvenir" de una edificación significa el remanente de su plazo de la vida útil o normal que en el caso de estas casas es de 60 años, de acuerdo con los peritos que testificaron; que el tribunal de instancia sólo concedió la reparación por una sexta parte de la vida útil o normal de las casas, pues el referido *built-up roof* sólo se garantiza por 10 años.

No es juicioso suponer que la norma establecida en *Géigel* v. *Mariani*, supra, al efecto de que "La construcción defectuosa impone al arquitecto o al contratista la obligación de reparar su culpa para lo porvenir restituyendo al edificio todas las cualidades de una buena construcción" incluya la obligación de mantener los techos impermeables durante toda la vida útil de la propiedad, pues es una realidad que la propiedad se deteriora por el mero transcurso del tiempo y por su uso corriente y ordinario y por lo tanto requiere conservación y mantenimiento que, en ausencia de pacto en contrario, es obligación de su dueño.

El tribunal de instancia estuvo en lo correcto al condenar a Tana-Ibec en la suma equivalente al costo del *built-up roof* en vista de la prueba aducida sobre esta cuestión. No incurrió en el apuntado error ya que el haber concedido cualquier suma adicional hubiera sido altamente especulativo. Además, en vista del término de prescripción de 10 años fijado por el Art. 1483 del Código Civil para toda reclamación de esta naturaleza, no puede responsabilizarse al contratista por la ruina que pueda acontecer luego de transcurrido ese término.

2.—Que el tribunal de instancia incurrió en error al no conceder partida alguna para gastos de mudanza, almacenaje de muebles y alquiler de vivienda por el término que requiera la reparación de los pisos y eliminación de grietas y manchas del plafón y pintar lo corregido en plafones y paredes.

La prueba con respecto a la necesidad de desalojar las viviendas en cuestión con el fin de que se realizaran las reparaciones de los vicios o defectos aludidos consistió del testimonio del perito de los reclamantes, Sr. Martín. Pero este testimonio partía de la teoría de este testigo de que debían sustituirse los techos defectuosos por otros de hormigón armado corriente. Resulta obvio de las determinaciones del tribunal de instancia que éste no sustuvo esa teoría, y por el contrario, concluyó que los techos en cuestión podían repararse. El perito Martín admitió que los techos estructuralmente estaban bien diseñados para servir los propósitos a que iban a ser destinados. Las reparaciones en cuestión, aunque indudablemente causarán muchas molestias a los reclamantes, no requieren para su ejecución que éstos desalojen sus casas, pues pueden realizarse por secciones de manera que éstas continúen habitables.

Concluimos, por lo tanto, que no se incurrió en el error en cuestión.

3.—Que el tribunal a quo erró al no conceder daños ejemplares o punitivos a los reclamantes.

En apoyo de este apuntamiento citan los reclamantes las siguientes determinaciones del juez sentenciador:

". . . La casa modelo que las demandadas construyeron para que sirviera de atracción a los potenciales compradores de las casas que habrían de seguir, justificaba a los demandantes [sic] esperar que algo igual habría de entregárseles de acuerdo con el contrato que suscribieron.

Que el sistema de hormigón celular (foam concrete) y las losas prefabricadas para los techos lo usaron las demandadas por primera vez en la casa modelo y ésta coló el agua y no se le informó nada de ello a los demandantes."

Apuntan, además, citando de las conclusiones de derecho: ([10])

---

([10]) Las conclusiones de derecho citadas son las siguientes:
"2. Que las demandadas con los resultados del techo prefabricado (Pre-Cast) en la casa modelo sin introducir ninguna clase de cambio en

"Que las demandadas con los resultados del techo prefabricado (Pre-Cast) en la casa modelo, *sin introducir ninguna clase de cambio en dichos techos,* se decidieron a continuar usando los mismos para todas las casas; y que la Ibec actuó negligentemente al continuar la construcción de las casas con este tipo de techo . . . *no obstante saber que su uso* constituía un riesgo por ser un experimento que no habría de ser satisfactorio con vista a los resultados obtenidos en la casa modelo . . . ." (Énfasis en el original.)

En los casos ante nos, concurrimos con el tribunal de instancia en que Tana-Ibec, aunque culpable de negligencia en la construcción, no incurrió en dolo. De la prueba no aparece que surgieran los hechos que en el derecho común justificaría condenar al pago de daños punitivos. Por lo tanto, no resulta necesario determinar si procede o no conceder tales daños. Es necesario señalar, sin embargo, que en *Miguel* v. *Hernaiz Targa & Co.,* 51 D.P.R. 585 (1937), aunque se hizo referencia a daños punitivos, la concesión que se hizo fue en realidad por los daños morales sufridos consistentes en la "vergüenza y humillación que hubo de producirles el verse expuestos ante el público como personas capaces de confabularse con otras para perpetrar un fraude." Véase, Velázquez, obra citada, *supra,* pág. 120.

*En vista de lo expuesto se modifica la sentencia en estos casos en los siguientes extremos:*

(1) Se deja sin efecto la condena en contra de Tana en la reclamación *quanti minoris* que se le hizo.

---

dichos techos se decidieron a continuar usando los mismos para todas las casas.

". . . . . . .

"8. Que la demandada Ibec, si bien es cierto que actuó negligentemente al continuar la construcción de las casas de este pleito usando el tipo de techo prefabricado (Pre-Cast) en las mismas no obstante saber que su uso constituía un riesgo por ser un experimento que no habría de ser satisfactorio con vista a los resultados obtenidos en la casa modelo, no actuó dolosa o fraudulentamente en la construcción de las casas de la Urbanización Highland Park."

(2) Se limita la sentencia a condenar a la recurrente Tana-Ibec, como una sola entidad en su carácter de constructora, a pagar a los reclamantes: (11)

(i) la cantidad especificada en el párrafo (a) de la sentencia, por el concepto y con excepción de los reclamantes indicados en dicho párrafo, o sea, Julia M. Benítez, Fernando Barron y José Ramón González.

(ii) por el concepto indicado en el párrafo (b) de la sentencia, la cantidad de $225 por cada una de las viviendas inspeccionadas por el juez sentenciador, con excepción del reclamante Leonard F. Partridge, quien testificó que en su casa las puertas y los marcos estaban en buenas condiciones, y de la reclamante mencionada en dicho párrafo, o sea, Julia M. Benítez. La cantidad de $215.43 (12) a cada uno de los demás reclamantes cuyas casas no fueron inspeccionadas por dicho juez por ser ésta la cantidad promedio correspondiente en estos casos de acuerdo con lo estipulado por las partes.

(iii) por el concepto indicado en el párrafo (c) de la sentencia $200 por cada una de las viviendas inspeccionadas por el juez sentenciador, excluyendo los reclamantes indicados en dicho párrafo, o sea, Julia M. Benítez, Fernando Ba-

---

(11) Al determinar las cantidades promedios atribuibles a las viviendas no inspeccionadas no hemos tomado en consideración el caso de Enrique Díaz porque, como indica Tana-Ibec, éste nunca radicó demanda para hacer valer sus derechos. De manera que no obstante haberse considerado como uno de los reclamantes, y de haberse inspeccionado su casa, en efecto, como ya indicamos, no le es extensiva ni le puede beneficiar la sentencia en este caso.

Con referencia a cuantías, los párrafos marcados con letras de la (a) a la (f) son los marcados con los números 1 al 6 en la parte II de esta opinión.

(12) Llegamos a esta cantidad multiplicando la cantidad concedida a las casas inspeccionadas por el número de reclamantes cuyas casas fueron inspeccionadas (menos los reclamantes Julia M. Benítez, Leonard Partridge y Enrique Díaz) y dividido el resultado por el número de reclamantes cuyas casas fueron inspeccionadas (menos Enrique Díaz), o sea,

$225 x 45 ÷ 47 = $215.43

rron y José Ramón González. La cantidad de $187.23 ([13]) a cada uno de los demás reclamantes cuyas casas no fueron inspeccionadas por dicho juez por ser ésta la cantidad promedio correspondiente en estos casos de acuerdo con lo estipulado por las partes.

(iv) por el concepto indicado en el párrafo (d) de la sentencia $750 por cada una de las viviendas inspeccionadas por el juez sentenciador excluyendo la reclamante indicada en dicho párrafo, o sea Julia M. Benítez. La cantidad de $734.04 ([14]) a cada uno de los demás reclamantes cuyas casas no fueron inspeccionadas por dicho juez por ser ésta la cantidad promedio correspondiente en estos casos de acuerdo con lo estipulado por las partes.

(v) por el concepto indicado en el párrafo (e) de la sentencia la cantidad de $250 por cada una de las viviendas inspeccionadas por el juez sentenciador de tipo Acapulco con excepción de las de los reclamantes Graciany Miranda Marchand, Robert Ruby, Milton Heath, Salvador Hernández Oviedo y Germán Sigurany. La cantidad de $193.18 ([15]) a cada uno de los demás reclamantes cuyas casas son de tipo

---

[13] Llegamos a esta cantidad multiplicando la cantidad concedida a las casas inspeccionadas por el número de reclamantes cuyas casas fueron inspeccionadas (menos Julia M. Benítez, Enrique Díaz, Fernando Barron y José Ramón González) y dividido el resultado por el número de reclamantes cuyas casas fueron inspeccionadas (menos Enrique Díaz), o sea,
$$\$200 \times 44 \div 47 = \$187.23$$

[14] Llegamos a esta cantidad multiplicando la cantidad concedida a las casas inspeccionadas por el número de reclamantes cuyas casas fueron inspeccionadas (menos Julia M. Benítez y Enrique Díaz) y dividido el resultado por el número de reclamantes cuyas casas fueron inspeccionadas (menos Enrique Díaz), o sea,
$$\$750 \times 46 \div 47 = \$734.04$$

[15] Llegamos a esta cantidad multiplicando la cantidad concedida a las casas inspeccionadas tipo Acapulco por el número de reclamantes, dueños de casas tipo Acapulco que fueron inspeccionadas (menos los reclamantes Graciany Miranda Marchand, Robert Ruby, Milton Heath, Salvador Hernández Oviedo y Germán Sigurany) y dividido el resultado por el número de reclamantes dueños de casas tipo Acapulco que fueron inspeccionadas, o sea,
$$\$250 \times 17 \div 22 = \$193.18$$

Acapulco y no fueron inspeccionadas por dicho juez por ser ésta la cantidad promedio correspondiente en estos casos de acuerdo con lo estipulado por las partes.

Por el concepto indicado en el párrafo (e) de la sentencia la cantidad de $325 por cada una de las viviendas inspeccionadas por el juez sentenciador de tipo Montecarlo, con excepción de los reclamantes Félix Matos y Julia M. Benítez. La cantidad de $299 (16) a cada uno de los demás reclamantes cuyas casas son de tipo Montecarlo y no fueron inspeccionadas por dicho juez por ser ésta la cantidad promedio correspondiente en estos casos de acuerdo con lo estipulado por las partes, con excepción de Genaro Báez, Juan A. Gómez, Miguelina Ayala, Mario Rocher y Julia Carmen Marchand, excepción ésta que el tribunal de instancia no fundamentó pero que los reclamantes no impugnaron en su recurso de revisión.

(vi) las cantidades especificadas por razón de daños y perjuicios según el penúltimo párrafo de la sentencia en este caso excepto en los casos de Robert E. Trent, Luis González Quiñones, Germán Sigurany, José A. Rivera, Ernesto Reyes Arnaldi, José Castellanos Lloréns, Manuel A. Fernández, José Ramón González y Fernando Barron que por ser compradores subsiguientes no pudieron sufrir tales daños.

(3) se imponen las costas a la parte perdidosa en la acción Núm. 66(a) del caso Núm. 61-5569 que lo fue la señora Julia M. Benítez.

### Certiorari C-64-24

En este recurso se impugna la concesión de costas y gastos de los reclamantes ascendentes a $7,810.

---

(16) Llegamos a esta cantidad multiplicando la cantidad concedida a las casas inspeccionadas tipo Montecarlo por el número de reclamantes, dueños de casa tipo Montecarlo que fueron inspeccionadas (menos los reclamantes Félix Matos, Julia M. Benítez y Enrique Díaz) y dividido el resultado por el número de dueños de casa tipo Montecarlo que fueron inspeccionadas (menos Enrique Díaz), o sea,

$$\$325 \times 23 \div 25 = \$299$$

La situación de hechos con respecto a esta cuestión es la siguiente:

En 20 de diciembre de 1963 los reclamantes radicaron un memorando de costas y gastos en el que solicitaban $7,300 de costas y gastos, desglosados en dos renglones, uno por servicios prestados por el ingeniero Martín y la firma Sacmag of Puerto Rico, Inc., por $5,615.30, y el otro por gastos de emplazamientos, sellos, notificaciones, fotocopias, deposiciones, etc., por $1,684.70. En 24 de diciembre de 1963 (cuatro días más tarde) Tana-Ibec presentó una moción solicitando que los reclamantes especificaran "todas las partidas de gastos y desembolsos necesarios incurridos en el pleito" y que se les concediera un término de diez días desde el recibo de esa relación para impugnar el memorando de costas y desembolsos.

Previa vista, el tribunal así lo ordenó y el 23 de enero de 1964 los reclamantes radicaron un memorando de costas, gastos y desembolsos donde se señalaban en distintas partidas los gastos y desembolsos, especificando más aún la segunda partida.

El 30 de ese mismo mes, Tana-Ibec presentó una moción de impugnación de memorando de costas, impugnando, con excepción de los gastos de sellos de radicación, todas las partidas: algunas por improcedentes, otras por excesivas, y otras por falta de las especificaciones necesarias para formar juicio sobre las mismas. La partida pagada a Sacmag of Puerto Rico, Inc., se impugnó porque "además de ser excesiva, dicho pago es ilegal."

El 7 de febrero de 1964, minutos antes de comenzar la vista sobre el memorando de costas, los reclamantes radicaron una moción solicitando permiso para enmendar el memorando de costas y en efecto radicar el memorando de costas y gastos. En esta vista solamente comparecieron los abogados de las partes a argumentar sus respectivos puntos de vista, y no se presentó prueba de clase alguna.

El 12 de marzo de 1964 el juez recurrido dictó una resolución aprobando totalmente el memorando de costas, incluyendo el memorando suplementario.

Tana-Ibec apunta que el tribunal de instancia incurrió en error al aprobar y conceder la totalidad de las costas y gastos incluidos en los memorandos de costas radicados por los reclamantes por los siguientes fundamentos:

(1) Que no se hizo constar ni se probó que los desembolsos relacionados en los memorandos de costas fueron necesarios y, por lo tanto, resultan improcedentes a la luz de la Regla Núm. 44.4 (b) de las Reglas de Procedimiento Civil.

(2) Que las distintas partidas son improcedentes, excesivas e irrazonables y no fueron identificadas, comprobadas ni sostenidas por prueba de clase alguna.

(3) Que la partida de "pago hecho a Sacmag of Puerto Rico, Inc." por asesoramiento pericial de $5,615.30 es, además, ilegal por ser compensación a una corporación por servicios profesionales de ingeniería.

(4) Que el memorando suplementario de costas y gastos radicado en 7 de febrero de 1964 fue radicado fuera de término.

■ No son incluibles como costas los gastos ordinarios de las oficinas de los abogados de los reclamantes tales como sellos de correo, materiales de oficina y transportación de los abogados durante una inspección ocular. Tampoco son incluibles como costas los gastos de transcripciones de récords de vistas cuando tales transcripciones se solicitan por ser convenientes pero no necesarias para los reclamantes. *Farmer* v. *Arabian American Oil Co.*, 379 U.S. 227, 233 (1964).

■ El gasto incurrido en obtener deposiciones es recobrable si son necesarias, aunque no se usen en las vistas del caso. *Hope Basket Co.* v. *Product Advancement Corp.*, 104 F.Supp. 444 (D.W.D. Mich. 1952).

En *Garriga, Jr.* v. *Tribunal Superior,* 88 D.P.R. 245 (1963), resolvimos con respecto a las costas en un juicio, que:

"(1) . . . . .· . . .

(2) Los tribunales sentenciadores ejercerán esa discreción con moderación y examinarán ·cuidadosamente los memorandos de costas en cada caso, especialmente cuando las costas reclamadas sean objeto de impugnación.

(3) Las costas que contempla la Regla 44.4 son gastos (a) necesarios, (b) incurridos y (c) ·razonables. Su razonabilidad se entenderá dentro de la realidad económica de Puerto Rico, y en cuanto a los gastos personales, además, se tendrá en cuenta la condición económica de las personas concernidas (testigos y litigantes). No se aprobarán gastos innecesarios, superfluos o extravagantes."

█ Nos parece que a la luz de esta doctrina, cuando se impugnó la necesidad y razonabilidad de las distintas partidas de costas y desembolsos, los reclamantes debieron aducir prueba justificativa de su necesidad y razonabilidad. Ni de la faz de los memorandos de costas, gastos y desembolsos ni del récord del caso aparece que las distintas partidas fueran cargos apropiados por razón de su necesidad o de que su cuantía fuese razonable, con excepción de las siguientes partidas:

1. (a) Emplazamientos, diligenciamientos y noti-
 . ficaciones — $96
 (b) Sellos de radicación ` — $45

Estas partidas no han sido objetadas por Tana-Ibec. `

2. Servicios prestados por el ingeniero Ignacio Martín y la firma Sacmag of Puerto Rico, Inc. $5,615.30.

En cuanto al pago hecho a la corporación Sacmag of Puerto Rico, Inc., sabemos que en el memorando de costas original se incluyó una partida de $5,615.30 como pagada por "servicios prestados por el ingeniero Ignacio Martín y la firma Sacmag of Puerto Rico, Inc." En el segundo

memorando de costas radicado con el objeto de particularizar las partidas incluidas en el primero, no se mencionó a Ignacio Martín. La prueba revela que Martín realizó todo el trabajo profesional de ingeniería en relación con la determinación de los defectos de construcción en las viviendas de los reclamantes y con respecto a la naturaleza, extensión y medio de corregir los mismos. Preparó un extenso informe en el que recogió y recopiló todos los datos y estimados, producto de sus estudios sobre cada edificación. En estas actividades tuvo ayuda en el aspecto de labor de oficina (*clerical work*), que es de suponer suplió la corporación en cuestión. El ingeniero Martín testificó detallada y ampliamente sobre sus referidos estudios y fue, además, extensamente contrainterrogado por los abogados de las demandadas.

■ Puede concluirse que la partida referente a servicios de ingeniería cubre los servicios profesionales del ingeniero Martín y la labor de oficina con relación a ellos en que incurrió Sacmag of Puerto Rico, Inc., que fueron todos pagados a esta última. Concluimos, además, que el monto pagado por tales servicios es justo y razonable. Aunque es posible que el pago a Sacmag of Puerto Rico, Inc., por servicios profesionales de ingeniería pudiera haber sido objetado inicialmente de acuerdo con nuestra doctrina en *Rasa Eng. Corp.* v. *Daubón*, 86 D.P.R. 193 (1962), la partida correspondiente al rembolso de este pago no adolece en sí de ilegalidad alguna de manera que su impugnación por la razón indicada es improcedente, ya que la relación de la posible ilegalidad con el rembolso solicitado es indirecta y colateral. *Sánchez* v. *Coll*, 69 D.P.R. 925, 929 (1949).

Nos falta por considerar la cuestión de si el memorando suplementario fue radicado en tiempo. En 7 de febrero de 1964 los reclamantes radicaron el memorando de costas suplementario con el fin de incluir tres partidas que por inadvertencia no se incluyeron en el memorando de 20 de diciembre

de 1963, que luego en 23 de enero de 1964 se rehizo y radicó detallando la segunda partida del mismo.

Para resolver esta cuestión tenemos que contestar los siguientes interrogantes:

1. ¿Fueron esos gastos que se relacionan en el memorando suplementario incurridos a la fecha del archivo en autos de copia de la notificación de la sentencia?

2. ¿Afectan las conclusiones adicionales las partidas relacionadas en el memorando suplementario?

3. ¿Es realmente la "notificación de sentencia" del 31 de enero de 1964 una "notificación de sentencia"?

De un estudio del memorando suplementario llegamos a la conclusión de que las partidas allí especificadas, de haber sido necesarias y razonables (pues sobre ese punto no tenemos, con relación a algunas partidas, prueba para determinar) lo fueron a la fecha del archivo en autos de copia de la notificación de la sentencia, en 16 de diciembre de 1963.

Las conclusiones adicionales de hecho que hizo el juez a quo no afectan o en modo alguno tienen que ver con las partidas relacionadas en el memorando suplementario.

Si partimos de la base de que la notificación del 31 de enero de 1964 es una "notificación de sentencia" llegaríamos a la conclusión de que el memorando de costas de 7 de febrero de 1964 estaba en término. Pero tal "sentencia" es sólo una *resolución* del juez de instancia sobre una *moción* de Tana-Ibec solicitando determinaciones de hecho adicionales.

Es obvio que este memorando suplementario se radicó luego de expirado el término de 10 días contados a partir del archivo en autos de copia de la notificación de la sentencia, que prescribe la Regla 44.4 (b) de las Reglas de Procedimiento Civil. En este caso el punto de partida para determinar si se radicó el memorando de costas dentro del referido término era el 16 de diciembre de 1963, fecha del

archivo en autos de copia de la notificación de la sentencia en estos casos.

■ Dicho término de 10 días *no* se puede prorrogar, de acuerdo con lo dispuesto en la Regla 68.2 del mismo cuerpo de Reglas, según esta Regla fue enmendada en 24 de enero de 1961, efectiva el 31 de julio de 1961. Por lo tanto, no procedía considerar el referido memorando suplementario y aprobar las costas incluidas en el mismo.

En vista de lo expuesto, sólo se aprueban las dos partidas de costas no objetadas y la partida de $5,615.30 pagados a Sacmag of Puerto Rico, Inc., por los servicios prestados por el ingeniero Ignacio Martín y la referida firma. Se deniegan las demás partidas por improcedentes unas, radicadas fuera de término otras, y las demás por no haberse justificado su necesidad o la razonabilidad de su cuantía. *A esos efectos se modifica la resolución del tribunal de instancia de 12 de marzo de 1964.*

El Señor Juez Presidente y los Señores Jueces Asociados Belaval y Blanco Lugo no intervinieron.

—O—

EN MOCIÓN DE RECONSIDERACIÓN

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal, en reconsideración.

San Juan, Puerto Rico, a 26 de abril de 1968

Todas las partes envueltas en este litigio incluyendo el *amicus curiae* han radicado mociones de reconsideración. No proceden, pero consideramos necesario exponer unos conceptos para disponer de dos fundamentos aducidos en favor de la reconsideración: (1) la improcedencia de los daños morales en esta clase de acción y (2) la inconformidad con la definición de lo que constituye "vicio de construcción" bajo

el Art. 1483 del Código Civil que expusimos en *Géigel* v. *Mariani*, 85 D.P.R. 46 (1962).

■ Se apunta que la concesión de daños morales resultantes de la violación o incumplimiento de un contrato es en la doctrina civilista una posición minoritaria. Una vez más reiteramos que al adoptar una regla o doctrina este Tribunal no es movido por el hecho de que ésta sea una de mayor o menor aceptación, sino que el criterio rector es que tal doctrina se adapte a nuestro derecho vigente y que éste sea a su vez la solución más indicada y conveniente para nuestra realidad económica, social y cultural. Pero, esto aparte, la verdad es que la doctrina que adoptamos está siendo aceptada por eminentes civilistas como lo constatan las citas que hicimos en la opinión dictada en el presente caso. Ante pág. 59–60.

■ Ahora bien, vale dejar sentado que al compensar por daños morales en esta clase de acciones los jueces deben ponderar cuidadosamente la concesión de éstos, limitándola a aquellos casos en que las condiciones de la construcción haya afectado en forma apreciable el estado emocional del reclamante. No todo vicio de construcción que dé derecho a que el constructor repare conlleva la concesión de daños morales. Los vicios deben ser de tal naturaleza que afecten la condición anímica de una persona.

■ Alegan los recurrentes que la norma establecida en el caso de *Géigel* v. *Mariani*, respecto a lo que constituye un vicio de construcción, es el resultado de una interpretación errónea de los comentarios de Colín y Capitant sobre dicho artículo. Sostienen que dicho autor se refería al Art. 2270 [17] del Código Civil Francés (el cual no tiene equivalente en

---

[17] Art. 2270 del Código Civil Francés:

"Después de diez años el arquitecto y los empresarios quedan descargados de la garantía de las obras que han hecho o dirigido."

nuestro derecho) y no al Art. 1792, ([18]) el cual sí equivale a nuestro Art. 1483. Colín y Capitant, *Derecho Civil*, t. 4, ed. 1955, pág. 497, al referirse a lo que debe entenderse por "construcción defectuosa" dice:

"Falta ahora saber que es lo que hay que entender por construcción defectuosa.

La opinión más favorable a los arquitectos y contratistas, que es la del Consejo de Estado (Cons. de Est., 18 de mayo de 1888, D.P. 89 5. 299), no comprende en la construcción defectuosa más que los vicios que pueden afectar a la solidez del edificio, y, como es natural, los vicios indiferentes para la solidez, tales como la mala calidad de las tejas y plomos empleados en las techumbres, la falta de juntura de las ventanas, el empleo de piedras salitrosas, etc. . . . quedan a cubierto con el recibo . . . .

Por nuestra parte, creemos preferible considerar, como lo hacen las jurisdicciones civiles, que la responsabilidad del constructor comprende, generalmente, *todas aquellas clases de vicios* que excedan la medida de las imperfecciones que cabe esperar en una construcción. . . . (Énfasis suplido.)

■ Evidentemente se está refiriendo a los vicios de construcción del Art. 1792 del Código Francés, máxime cuando se ha determinado que por vicio de construcción se entiende defectos de construcción. (*Géigel* v. *Mariani*, a la pág. 50.) Respecto a la alegada gran diferencia entre el Art. 1792 y el 2270 del Código Civil Francés, Luarent, *Derecho Civil Frances*, págs. 30–57 (ed. 1900) nos expone la interpretación mayoritaria de los autores franceses sobre tales artículos, la cual es contraria a la contención de los recurrentes. Nos dice al respecto:

"Llegamos a una cuestión más difícil y muy controvertida. El art. 1792 declara al arquitecto responsable por la pérdida total o parcial del edificio, cuando perece por vicio de construc-

---

([18]) Art. 1792:

"Si el edificio construído por precio alzado se arruina en su totalidad o en parte a consecuencia de un vicio de construcción, aun cuando se trate de´un vicio del suelo, el arquitecto y el contratista serán responsables durante diez años."

ción y por un vicio del suelo, y, según el art. 2270, el arquitecto es garante de las obras que dirige. ¿Estos dos artículos establecen una sola y misma responsabilidad, o preveen casos diferentes y estos casos están regidos por principios diferentes? Los autores enseñan generalmente que el art. 2270 completó la disposición del art. 1792, extendiendo a todos los otros, la responsabilidad que el art. 1792 parecía limitar a la construcción de edificios a prefijo.

*En teoría preferimos la opinión enseñada por la generalidad de los autores.* La responsabilidad del arquitecto es una, y no múltiple; deriva de la misma causa, de la diligencia que ofrece tener en la ejecución de sus obligaciones; son los cuidados de un buen padre de familia que debe tener cualquier deudor, cuidados que se especializan por razón de la especialidad de la obra, en este sentido: que el arquitecto debe tener todos los cuidados de un buen arquitecto; es responsable cuando no satisface esta obligación. . . .

. . . ambos artículos tienen un solo y mismo objeto, el de determinar el tiempo durante el cual el arquitecto responde por los vicios de construcción y del suelo, después de haber sido los trabajos examinados y recibidos; la identidad del plazo implicaba identidad de ambas disposiciones . . . .

. . . Las *obras gruesas* del artículo 2270 entran, por consiguiente, en los trabajos de construcción del artículo 1792, es un solo y mismo trabajo, solo que el art. 1792 se refiere a la construcción total del edificio, mientras que el art. 2270 comprende los trabajos parciales. Puesto que la naturaleza del trabajo es la misma, el principio debe ser idéntico. ¿De qué se trata? Se trata de saber si los trabajos son de tal naturaleza que el propietario no los pueda administrar cuando la recepción en este sentido: que le sea difícil o imposible comprobar sus vicios; y es bien evidente que esta dificultad e imposibilidad son las mismas cuando los trabajos son parciales o cuando abarcan todo el edificio. En todos los casos son obras que deben asegurar la solidez del edificio: el propietario no puede convencerse de tal solidez más que si los trabajos se conservan durante cierto tiempo que la ley fija, diez años. *Síguese de estos que los arts. 1792 y 2270 preveen la misma clase de trabajos, y fuera extraño, inexplicable, que para trabajos idénticos la ley estableciera principios diferentes.*" (Énfasis suplido.)

■ Así no vemos que se justifique el modificar la norma adoptada en el caso de *Géigel* v. *Mariani* al efecto de "que la responsabilidad del constructor, comprende, generalmente, todas aquellas clases de vicios que excedan de la medida de las imperfecciones que cabe esperar en una construcción. Colín y Capitant, Vol. 4, *Curso Elemental de Derecho Civil*, pág. 349 (ed. 1925)."

*Se declarará sin lugar la moción de reconsideración.*

El Juez Presidente Señor Negrón Fernández y el Juez Asociado Señor Blanco Lugo no intervinieron.